UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

DERRICK WILSON,

                              Plaintiff,

                                                          5:20-CV-1489
v.                                                        (GTS/TWD)

COUNTY OF ONONDAGA, et al.,

                              Defendants.
——————————————————————————

APPEARANCES:

DERRICK WILSON
Plaintiff, *pro se*
21481-052
Yazoo City Medium
Federal Correctional Institution
Inmate Mail/Parcels
P.O. BOX 5000
YAZOO CITY, MS 39194


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### **ORDER AND REPORT-RECOMMENDATION**

## I.    INTRODUCTION

The Clerk has sent to the Court for review a *pro se* complaint filed by Plaintiff Derrick

Wilson ("Wilson" or "Plaintiff") pursuant to 42 U.S.C. § 1983, together with an application to

proceed *in forma pauperis* ("IFP Application"). (Dkt. Nos, 1, 2.) Plaintiff is incarcerated and

has not paid the filing fee for this action. For the reasons discussed below, the Court grants

Plaintiff's IFP Application and recommends that Plaintiff's complaint be accepted in part for

filing.

**II.     IFP APPLICATION**

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  Upon review, Plaintiff has submitted a completed and signed IFP Application, which demonstrates economic need.  (Dkt. No. 2.) Plaintiff has also filed the inmate authorization form required in this District.  (Dkt. No. 6.) Accordingly, Plaintiff's IFP Application is granted.

**III.    SUFFICIENCY OF THE COMPLAINT**

**A.     Standard of Review**

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).

Similarly, § 1915A directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune

from such relief." 28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both §§ 1915 and 1915A are available to evaluate prisoner *pro se* complaints).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. Thus, a pleading that contains only allegations which "are so vague as to fail to give the

defendants adequate notice of the claims against them" is subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 191 (2d Cir. 2008) (citation omitted).

**B.    The Complaint**

As summarized by Plaintiff:

> This civil rights action arises from the collusive fabrication of evidence by governmental official and forensic analyst, throughout a 17 year period, from April 23, 2000 – December 5, 2017, in which all Defendants acted in concert, aided and abetted, and conspired with each other to manufacture false evidence against Derrick Wilson to frame Wilson for the April 23, 2000 shooting homicide of Waliek Hamer, in Syracuse, New York.

(Dkt. No. 1 at ¶ 1.[1])  Named as Defendants are: County of Onondaga; City of Syracuse; Onondaga County District Attorney ("DA") William J. Fitzpatrick; former Onondaga County Assistant District Attorneys ("ADA") Stephen Dougherty, Matthew Doran, and Michael

---

[1]  Unless noted, excerpts from the complaint are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Ferrante; Assistant United States Attorney ("AUSA") Carla Freedman; current and former members of the City of Syracuse Police Department ("SPD") David Proud, Christopher Lundborg, John Nolan, Daniel Babbage, Randy Collins, Timothy Galineu, Mary Ellen Gossin, William Kittel, Don Hilton, and James Quatrone; Onondaga County's Wallie Howard Jr., Center for Forensic Science ("CFS") Interim Director ("Dir.") Kathleen Corrado, CFS Firearms Analyst Justine Kreso and CFS Forensic Analyst Matthew Kurimsky; and independent firearms analyst Joseph Cominolli. (Dkt. No. 1 at ¶¶ 8-33.[2])

The complaint states that "[o]n June 18, 2014, Wilson was arrested for federal drug conspiracy and has been incarcerated based on the federal arrest and subsequent to sentencing in that matter from June 18, 2014 to the present date." *Id*. at ¶ 2.[3] On October 22, 2015, while incarcerated for the federal drug charge, Wilson was arrested pursuant to a sealed indictment in Onondaga County Court for the homicide of Waliek Hamer, *People v. Derrick Wilson*, Ind. No. 2015-0866-1. *Id*. at ¶ 3. Trial commenced on November 27, 2017, and after representing himself *pro se*, Wilson was acquitted of this homicide on December 5, 2017. *Id*.

According to Plaintiff, "[b]y the government officials conspiring with each other and others to manufacture false evidence during the 15 years investigative stage of the Hamer prosecution, and presenting such false evidence at Wilson's state criminal trial, Defendants infringed upon Wilson's 'absolute' constitutional right to a fair trial." *Id*. at ¶ 4. Plaintiff claims Defendants' "horrendous and unlawful conduct violated New York and Federal law and entitled

---

[2] The Clerk is directed add the "City of Syracuse" as a Defendant in this action as set forth in paragraph 33 of the complaint.

[3] According to the public website maintained by the Federal Bureau of Prisons ("BOP"), Wilson's earliest release date is June 7, 2038. *See* https://www.bop.gov/inmateloc (BOP Register Number: 21481-052) (last visited Apr. 21, 2021).

Wilson to nominal compensatory and punitive damages under 42 U.S.C. § 1983, a federal statute authorizing a civil rights lawsuit based on such conduct." *Id*. at ¶ 5.

By way of background, Plaintiff states that during the early morning hours of April 23, 2000, Hamer was "fatally wounded by gunshots from an unknown assailant on South Salina Street in Syracuse, New York" on the sidewalk in front of "late-night eatery" Grandma Burgers. *Id*. at ¶¶ 37, 38. Members of the SPD, including Hilton, Proud, Babbage, and Quatrone arrived on the scene, secured the area, and began their investigation. *Id*. at ¶ 39.[4] Within hours of initiating their investigation, members of the SPD learned Plaintiff was also present at Grandma Burgers, an area classified by the SPD as "Brighton Brigade gang territory," around the time Hamer was murdered. *Id*. at ¶¶ 38, 40. Once Proud and Quatrone received this information, they began to "conspire" with each other and other members of the SPD to "fabricate evidence" against Plaintiff and "bribe and coerce witnesses to falsely implicate" Plaintiff as the "perpetrator of the Hamer homicide." *Id*. at ¶ 41.[5]

"In the immediate aftermath of the Hamer homicide investigation," Proud, Quatrone, and "other members of the SPD," conspired with each other to "bribe and coerce" Brighton Brigade gang members, including Witness Doe 1-4,[6] to falsely implicate Wilson in the Hamer homicide. *Id*. at ¶¶ 51-74. In April 2000, Witness Doe 3 and Witness Doe 4 were interviewed by SPD and

---

[4] Plaintiff claims that during this time period, Hilton and Quatrone were employed by the SPD as a sergeant and detective, respectively, and they are currently employed by the Onondaga County District Attorney's Office as investigators. (Dkt. No. 1 at ¶¶ 26-27, 39.)

[5] According to Plaintiff, members of the SPD were "angry" because Plaintiff had filed a previous civil rights action against the City of Syracuse and members of the SPD for subjecting Wilson to an illegal cavity search. (Dkt. No. 1 at ¶ 42, citing *Derrick Wilson v. City of Syracuse*, No. 5:98-cv-01718.) After filing this lawsuit, Proud and Quatrone "threatened and harassed" Plaintiff "incessantly." *Id*.

[6] Plaintiff states the names of non-party individuals have been changed to "Witness Doe 1 thru Doe 4" and will be disclosed during discovery. (Dkt. No 1 at ¶ 51 n.1.)

informed by Quatrone that "they would both be charged with the murder of Hamer unless they each identified Plaintiff as the person who shot and killed Hamer.  *Id*. at ¶¶ 54-55.  "Under duress" from "Quatrone's threat of prosecution," Witness Doe 3 and Witness Doe 4 signed affidavits on April 23, 2000, implicating Plaintiff in the Hamer homicide."  *Id*.  Specifically, Witness Doe 3 swore "that he witnessed the Hamer homicide and was 85% sure that Plaintiff was the person that shot and killed Hamer."  *Id*. at ¶ 56.  Witness Doe 4 swore "that he witnessed the homicide and it was either Plaintiff or [ ] Barasheim Moody that shot and killed Harmer." *Id*. at ¶ 57.

On May 19, 2000, Proud and Lundborg were working the "'Sweep' detail, conducting an investigation into Plaintiff for alleged drug activity."  *Id*. at ¶ 45.  Plaintiff was arrested for unlawful possession of marijuana.  *Id*.  Lundborg "falsified a report averring that on May 19, 2000," Wilson "made the following spontaneous utterances, 'You think I did that murder', 'You guys are trying to make a case on me', 'you are talking to everyone except me about that, how come you don't talk to me?' and 'I was there, but I didn't do it' 'I didn't kill anybody'."  *Id*. at ¶ 47.  Plaintiff claims he never made these statements.  *Id*.  During Wilson's criminal trial for the Hamer homicide, Lundborg falsely testified that Plaintiff made the aforementioned "spontaneous utterances."  *Id*. at ¶ 50.

Additionally, between April and May 2000, Quatrone "bribed" Witness Doe 1 into falsely implicating Plaintiff as the person who shot and killed Hamer by "propositioning" Witness Doe 1 that if he "incriminated Plaintiff and persuaded Witness Doe 2 to do the same," Witness Doe 1 "would receive a reduced sentence for the criminal charges he was facing."  *Id*. at ¶ 59.  On June 6, 2000, Witness Doe 2 signed an affidavit swearing that he actually did witness Plaintiff shoot and kill Hamer, which differed from his prior statements.  *Id*. at ¶ 60.

Between May and June 2000, Witness Doe 1 met with ADA Dougherty and members of the SPD that were investigating the Hamer homicide wherein Witness Doe 1 "falsely stated" that on May 20, 2000, "Plaintiff told Witness Doe 1 that he shot and killed Hamer." *Id*. at ¶ 61. "Between May 7, 2000 through July 18, 2000 ADA Dougherty searched for evidence and clues to corroborate Witness Doe 1's statement." *Id*. at ¶ 62. On July 18, 2000, ADA Dougherty "administered" for Witness Doe 1 to take a polygraph test. *Id*. at ¶ 63. Although the polygraph test confirmed Witness Doe 1 was telling the truth, ADA Dougherty "still had concerns about Witness Doe 1's credibility and could not find any evidence to corroborate his statement." *Id*.

ADA Dougherty met with Witness Doe 1 and his lawyer and "bribed Witness Doe 1 into providing false testimony at a grand jury that Plaintiff told Witness Doe 1 that he killed Hamer; and for Witness Doe 1 to ensure that his friends—Witness Doe 2, Witness Doe 3, and Witness Doe 4—who were expressing disinterest in testifying at a grand jury, would testify falsely at a grand jury that they witnessed Plaintiff shoot and kill Hamer." *Id*. at ¶ 64. For his assistance, ADA Dougherty promised Witness Doe 1 a reduced sentenced in the criminal charges he was facing. *Id*. at ¶ 65.

DA Fitzpatrick was briefed by ADA Dougherty as to Witness Doe 1's statement and, on August 23, 2000, at the direction of DA Fitzpatrick, ADA Dougherty convened a grand jury proceeding, during which all four of the Doe Witnesses presented false evidence. *Id*. at ¶¶ 67-71. For his part, Witness Doe 1 received a reduced sentence in a separate criminal manner. *Id*. at ¶ 72.

Plaintiff further claims that non-party Jamal Harris was interviewed numerous times in the year of 2000 by members of the SPD and that on May 12, 2000, he signed an affidavit swearing that he did not witness Plaintiff "having any involvement in the Hamer homicide." *Id*.

at ¶ 75. Between April 2000 and June 2014, Proud and other members of the SPD "made a multitude of propositions to Harris" to change his sworn statement "from one not inculpating Plaintiff in the Hamer homicide to one falsely inculpating Plaintiff." *Id*. at ¶¶ 76-78. Proud told Harris if he changed his May 12, 2000, statement, he would receive a "get out of jail free card." *Id*. at ¶ 79.

As noted, on June 18, 2014, Plaintiff was arrested in this District, along with twelve others for federal drug conspiracy. *Id*. at ¶ 80. Harris was arrested as an alleged coconspirator of the drug conspiracy. *Id*. "Facing a life sentence in the federal drug case," Harris "accepted Proud's bribe to change his May 12, 2000, sworn statement to falsely implicate Plaintiff as the person who shot and killed Hamer." *Id*. at ¶ 82.

On Septmeber 22, 2014, members of the federal government and SPD met in AUSA Freedman's office, including Defendants AUSA Freedman, Babbage, and Nolan. *Id*. at ¶ 83. At this September 22, 2014, meeting Harris changed his May 12, 2000, sworn statement "by averring he witnessed Plaintiff shoot and kill Hamer, and that he furnished Plaintiff with the murder weapon—a 9 mm Lorcin, and that the SPD had recovered the murder weapon back in the year of 2000." *Id*. at ¶ 84. Additional meetings were held in AUSA Freedman's office on January 22, 2015, and on August 4, 2015, to finalize Harris' "get out of free jail card." *Id*. at ¶¶ 85-87.

Between September 22, 2014, through Septmeber 25, 2014, Proud, Galineu, Babbage, Gossin, Kittel, and Collins "did computer research and falsely identified a photograph of a 9mm Lorcin that was removed by the SPD on August 25, 2000, in an unrelated investigation as the murder weapon in the Hamer homicide." *Id*. at ¶ 90. "Despite there being no chain of custody" and having "already examined and forensically excluded [it] as the murder weapon," CFS Dir.

Corrado, Kreso, and Kurimsky "falsely identified random test fired ammunition to be the test fired ammunitions from the 9mm Lorcin." *Id*. at ¶ 93.

In October and November of 2014, Kurimsky and Kreso, at the direction of Hilton and Dir. Corrado, falsified microscopic comparison reports and results between the projectiles and cartridge casings from the Hamer homicide investigation and the manufactured false test fired ammunition from the 9mm Lorcin. *Id*. at ¶¶ 94-95. This information was reported back to AUSA Freeman, ADA Doran, and ADA Ferrante during the January 22, 2015, meeting. *Id*. at ¶ 96.

Thereafter, DA Fitzpatrick was briefed by ADA Doran and ADA Ferrante and, on September 1, 2015, at the direction and instruction of DA Fitzpatrick, a grand jury was convened by ADA Doran and ADA Ferrante during which Harris "provided bribed and false testimony." *Id*. at ¶ 88. On Septmeber 3, 2015, Kurimsky provided false testimony at the grand jury. *Id*. at ¶ 98. He also falsely testified during Wilson's 2017 criminal trial for the Hamer homicide. *Id.*

During Wilson's 2017 criminal trial, the prosecution introduced manufactured false evidence of photographs of the 9mm Lorcin into evidence as Government Trial Exhibits 30, 31, 32, and 33. *Id*. at ¶ 100. They also introduced manufactured false ballistic evidence by introducing manufactured test fired shell casing ammunition into evidence as Government Trial Exhibit 34. *Id*. at ¶ 101. Plaintiff claims Cominolli, an independent firearms analyst, "conspired" with Quatrone to prevent Plaintiff from conducting his own microscopic ballistic analysis and comparison. *Id*. at ¶¶ 106-111. Cominolli never conducted the "court ordered" microscopic analysis and comparison. *Id.*

Lastly, Plaintiff claims DA Fitzpatrick was aware of the facts pertaining to the conspiracy between the members of the SPD and Onondaga County to bribe and coerce Brighton Brigade

members to falsely implicate Plaintiff in the Hamer homicide, and ordered ADA Dougherty to convene the August 2000 grand jury proceeding. *Id*. at ¶ 104. DA Fitzpatrick also was aware of the facts pertaining to the conspiracy between the members of the SPD, Onondaga County, CFS, and AUSA Freedman to fabricate gun and ballistic evidence, and ordered ADA Doran and ADA Ferrante to convene the September 2015 grand jury proceeding. *Id*. at ¶ 105. On October 22, 2015, DA Fitzpatrick "gave a public conference that was aired on local television networks . . . announcing Plaintiff's arrest for the 15 years old Hamer homicide, and falsely promulgated to the public that there was ballistic evidence that placed the murder weapon in Plaintiff's hands, despite DA Fitzpatrick knowing that such evidence did not exist." *Id*. at ¶ 106.

The complaint sets forth four causes of action: (1) evidence manufacturing; denial of a fair trial under the Fifth, Sixth, and Fourteenth Amendments against all Defendants, *id*. at ¶¶112-19; (2) *Monell* claim against Onondaga County for the actions of DA Fitzpatrick, *id*. at ¶¶ 120-26; (3) *Monell* claim against Onondaga County for the actions of Dir. Corrado, *id*. at 127-32; and (4) civil conspiracy against all Defendants, *id*. at ¶¶ 133-39. The Court notes that on the first page of the complaint, Plaintiff also indicates he asserts a *Monell* claim against City of Syracuse. As relief, Plaintiff seeks monetary damages. For a complete statement, reference is made to Plaintiff's complaint.

### C. Nature of Action

Plaintiff seeks relief pursuant to § 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990)); *see also Myers v. Wollowitz*, No. 95-CV-0272 (TJM), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (finding that "[Section] 1983 is the vehicle by which individuals may seek redress for alleged violations

of their constitutional rights").  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  To state a claim under § 1983, the plaintiff must allege both that the defendant has violated plaintiff's rights under either the Constitution or laws of the United States and that the defendant acted "under color of state law."  *Rae v. City of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983.

## IV.   ANALYSIS

### A.   Prosecutorial Immunity Bars Plaintiff's Claims Against DA Fitzpatrick, ADA Dougherty, ADA Doran, and ADA Ferrante

It is well-settled that "[p]rosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'"  *Joyner v. Cty. of Cayuga*, No. 5:20-CV-1904088 (MAD/TWD), 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (quoting, *inter alia*, *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate."  *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)).  The function performed by the prosecutor defines the scope of this immunity.  *See Imbler*, 424 U.S. at 430; *Warney v. Monroe Cty.*, 587 F.3d 113, 121 (2d Cir. 2009).  Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31, while administrative duties or investigatory functions are not so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Warney*, 587 F.3d at 121.

"This protection encompasses 'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.'"  *Peters v. City of*

*Buffalo*, 848 F. Supp. 3d 378, 385 (W.D.N.Y. 2012) (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). Thus, absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley*, 509 U.S. at 273. This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316 (PGG), 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00 CIV 3626 (SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321-22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns*, 500 U.S. at 490 (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley*, 509 U.S. at 273; *see Kanciper v. Lato*, 989 F. Supp. 2d 216, 228-29 (E.D.N.Y. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" (quoting *Day v. Morgenthau*, 909 F.2d 75, 77-78 (2d Cir. 1990))). In *Peters*, the court listed activities such as orchestrating a sting operation, authorizing wiretaps, and assisting in the execution of a warrant as investigative or administrative that do not deserve absolute prosecutorial immunity. *Peters*, 848 F. Supp. 2d at 386 (citing cases).

Here, Plaintiff names DA Fitzpatrick, and former ADAs Dougherty, Doran, and Ferrante as Defendants in their individual and official capacities. (Dkt. No. 1 at ¶¶ 13-16.) Plaintiff states these Defendants are sued "only" for their conduct during the "investigative and administrative phase" and "excluding the advocacy phase." *Id.* After carefully considering the matter, the Court finds that despite labeling such actions "investigative and administrative," the allegations make clear that these Defendants are being sued related to their roles regarding each prosecutor's preparation for the initiating of a prosecution or for judicial proceedings and, therefore, are entitled to absolute prosecutorial immunity.

As set forth above, in the complaint, Plaintiff alleges ADA Dougherty met with Doe Witness 1 between May and July 2000 to ascertain whether his statements implicated Plaintiff in the Hamer homicide and to determine whether to present such statements to a grand jury. DA Fitzpatrick directed ADA Dougherty to convene a grand jury. ADA Dougherty then bribed the witness to give false testimony at the grand jury. Similarly, ADAs Doran and Ferrante presented the "bribed, coerced false testimony" from 2000 to the 2015 grand jury at the direction of DA Fitzpatrick. Thereafter, DA Fitzpatrick made false statements, including during a television appearance, after Wilson's indictment.

To the extent Plaintiff claims these Defendants knew at the time of Plaintiff's case being presented to the grand juries that evidence and testimony was false and, nevertheless, conspired to present the same, such allegations relate to their roles in presenting the case to the grand jury; conduct for which they are entitled to absolute prosecutorial immunity. *See Hill*, 45 F.3d at 661-62 (holding that "that prosecutors are immune from § 1983 liability for their conduct before a grand jury") (citations omitted); *see also Bernard v. Cty, of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted).

Therefore, the Court recommends dismissing Plaintiff's 1983 claims against DA

Fitzpatrick, ADA Dougherty, ADA Doran, and ADA Ferrante pursuant to 28 U.S.C. §

1915(e)(2)(B) and 28 U.S.C. § 1915A(b) based on absolute prosecutorial immunity.

Additionally, to the extent that Plaintiff seeks to impute the conduct of these Defendants

to Onondaga County, the claim must necessarily be dismissed.  The Second Circuit Court of

Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent

official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney

in New York State, acting in a quasi-judicial capacity, represents the State not the county."  *Baez*

*v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704

F. Supp. 1177, 1184 (S.D.N.Y. 1988).  Since DA Fitzpatrick, ADA Dougherty, ADA Doran, and

ADA Ferrante were acting on behalf of the State of New York, and not Onondaga County, any

alleged misconduct on these Defendants' part cannot be imputed to Onondaga County.

### B.    Prosecutorial Immunity Bars Plaintiff's Claim Against AUSA Freedman

Section 1983 provides redress for individuals who have been injured by a person acting

under color of state law; it does not create a cause of action against persons who act under color

of federal law.  *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 398 (1971) (Harlan, J.,

concurring).  AUSA Freedman is an official of the federal government, and, as such, is not

deemed a person acting under color of state law pursuant to § 1983.  However, in view of

Plaintiff's *pro se* status, the Court will construe any § 1983 claim against AUSA Freedman as an

action under *Bivens*.  *See Tavarez v. Reno*, 54 F.3d 109 (2d Cir. 1995).

In *Bivens*, the Supreme Court recognized that certain circumstances may give rise to a

private cause of action against federal officials that is comparable to the statutory cause of action

permitted against state officials by § 1983.  However, *Bivens* claims are available only against

federal government officers in their individual capacities.  The federal government itself and its agencies are immune from suit absent a waiver of sovereign immunity, and the Supreme Court has specifically declined to waive such immunity to allow a claim against a federal agency under *Bivens*.  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 486 (1994).

Here, Plaintiff names AUSA Freedman as a Defendant in her individual and official capacity.  (Dkt. No. 1 at ¶ 17.)  Plaintiff states she is sued "only" for her conduct during the "investigative and administrative phase" and "excluding the advocacy phase."  *Id*.

After carefully considering the matter, the Court finds that AUSA Freedman, in her capacity as a federal prosecutor, is entitled to absolute prosecutorial immunity with respect to the claims in this action.  *See Hartman v. Moore*, 547 U.S. 250, 261-62 (2006) (noting that absolute prosecutorial immunity protects federal prosecutors facing *Bivens* actions).  The only allegations against AUSA Freedman are that meetings were held in her office in 2014 and 2015, presumably through her role as a prosecutor in connection with and following Plaintiff's arrest in 2014 for federal drug conspiracy.  Plaintiff does not allege that AUSA Freedman acted outside of her prosecutorial function.

Accordingly, AUSA Freedman is immune from suit challenging acts she undertook in her capacity as a prosecutor and, therefore, the Court recommends dismissing any claim against her pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) based on absolute prosecutorial immunity.

### C.    Fabrication of Evidence

When a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty, the official infringes the accused's constitutional right to a fair trial in a manner that may be redressable in a

§ 1983 action for damages.  *McDonough v. Smith*, 139 S. Ct. 2149, 2156-57 (2019); *accord Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer acting in an investigating capacity."); *see Zahrey v. City of New York*, 2009 WL 1024261, at *8 n.14 (S.D.N.Y. Apr. 15, 2009) (noting that "evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him" and characterizing plaintiff's evidence fabrication claim as a claim for violation of procedural due process under the Fifth, Sixth, and Fourteenth Amendments); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.").

To state a claim for the denial of a fair trial based on the fabrication of evidence, a plaintiff must plausibly allege that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 30).  However, testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong.  *Id*.

Here, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, the Court recommends that a response be required to Plaintiff's fabrication of evidence claim against

Proud, Lundborg, Nolan, Babbage, Collins, Galineu, Gossin, Kittel, Hilton, Quatrone, Corrado, Kreso, and Kurimsky in their individual capacities.

However, to the extent Plaintiff purports to sue these Defendants in their "official capacity," as current or former employees of the SPD and/or CFS, Plaintiff would be suing the City of Syracuse and Onondaga County because "a § 1983 suit against a  municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005) (citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)).  Therefore, the Court recommends dismissing any claims against these Defendants in their "official capacity" as redundant and duplicative of any claim asserted against the City of Syracuse and/or the County of Onondaga, which the Court addresses below in Part IV.F.

### D.    Conspiracy

To adequately assert a conspiracy claim under § 1983 a plaintiff must allege: (1) an agreement between two or more state actors or between a state actor and private actor; (2) to act in concert to inflict an unconstitutional injury on plaintiff; and (3) an overt act committed in furtherance of that goal causing damages.  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).

"[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ciambriello*, 292 F.3d at 325 (internal quotations and citation omitted); *see also Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds"); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory,

vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot

withstand a motion to dismiss.").   "[A]lthough a plaintiff does not need to provide detailed

factual allegations, the allegations in the complaint must be 'enough to raise a right to relief

above the speculative level.'"   *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 283 (N.D.N.Y. 2018)

(quoting *Twombly*, 550 U.S. at 554) (other citation omitted).

Here, Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes

only vague statements throughout the complaint that all Defendants somehow acted in

conspiracy with another.   Notably absent from the complaint are specific facts plausibly

indicating an agreement between the individual Defendants and/or to violate Plaintiff's

constitutional rights.   *See Jae Soog Lee v. Law Office of Kim & Bae, PC*, 530 F. App'x 9, 10 (2d

Cir. 2013) (finding no conspiracy claim where plaintiff did not allege an agreement).

Thus, the Court recommends dismissing Plaintiff's conspiracy claim against all

Defendants pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a

claim upon which relief may be granted.

### E.   State Action

It is well-established that § 1983 "excludes from its reach merely private conduct, no

matter how discriminatory or wrongful."   *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50

(1999) (quotation marks and citation omitted).   A plaintiff, however, can establish that a private

actor was acting under color of state law by proving either: "(1) the existence of joint activity

between the private actor and the state or its agents, or (2) a conspiracy between the state or its

agents and the private actor."   *Young v. Suffolk Cty.*, 922 F. Supp. 2d 368, 385 (E.D.N.Y. 2013).

"To establish joint action, a plaintiff must show that the private citizen and the state

official shared a common unlawful goal; the true state actor and the jointly acting private party

19

must agree to deprive the plaintiff of rights guaranteed by federal law." *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quotation marks and citation omitted)).  Alternatively, as set forth above, to show that there was a conspiracy between a private actor and the state or its agents, a plaintiff must provide evidence of "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324-25 (2d Cir. 2002)).  These two methods of demonstrating state action – "joint action" and "conspiracy with" – are "intertwined" and overlap in significant respects.  *Harrison v. New York*, 95 F. Supp. 3d 293, 322 (E.D.N.Y. 2015) (quotation marks and citation omitted).

Here, Plaintiff alleges in wholly conclusory fashion that Cominolli, an independent firearms analyst, conspired with Quatrone to prevent Plaintiff from conducting his own microscopic ballistic analysis and comparison.  (Dkt. No. 1 at ¶¶ 106-111.)  Plaintiff has not alleged any facts from which the Court could reasonably construe a plausible § 1983 conspiracy or joint actor claim.  Therefore, the Court recommends dismissing Plaintiff's § 1983 claims against Cominolli pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F.    Municipal Liability

A municipality may only be named as a defendant in certain circumstances.  Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. 658); *see also*

*Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove

the existence of a municipal policy or custom in order to show that the municipality took some

action that caused his injuries beyond merely employing the misbehaving officer.").

A municipality may be liable for deprivation of constitutional rights under § 1983 for

policies or customs resulting in inadequate training, supervision, or hiring when the failure to

train, supervise, or hire amounts to deliberate indifference to the rights of those with whom

municipal employees will come into contact.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378,

388-89 (1989).  A plaintiff must also establish a causal connection – an affirmative link–between

the policy and the deprivation of his constitutional rights.  *Oklahoma v. Tuttle*, 471 U.S. 808, 823

(1985) (plurality opinion).

A municipality may not be held liable solely because it employs a tortfeasor.  *Los*

*Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010).  Indeed, municipalities may only be

held liable when the municipality itself deprives an individual of a constitutional right; it "may

not be held liable on a theory of *respondeat superior*."  *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir.

2000).  Only when the municipality, through the execution of its policies, actually deprives an

individual of his constitutional rights, is it liable for the injury.  *Monell*, 436 U.S. at 694.

As noted, Plaintiff alleges *Monell* claims against Onondaga County for the actions of DA

Fitzpatrick and Dir. Corrado.  (Dkt. No. 1 at ¶¶ 120-26, 127-32.)  The first page of the complaint

also references a *Monell* claim against City of Syracuse.  Here, Plaintiff has not made any

allegations that would approach stating a claim against the County of Onondaga or City of

Syracuse.  *See Gray-Davis v. New York*, 14-CV-1490 (GTS/TWD), 2015 WL 2120518, at *6

(N.D.N.Y. May 5, 2015) ("Without supporting factual allegations of, among other things, a

policy or custom pursuant to which the alleged action was undertaken, [Plaintiff] fails to state a

claim against those municipalities that is plausible on its face."); *Hawthorne v. City of Albany*, 17-CV-0716 (GTS), 2017 WL 6520774, at *5 (N.D.N.Y. Nov. 14, 2017) (same).

As to Onondaga County, "[i]n this Circuit, a county may be liable pursuant to § 1983 for the actions of the district attorney in limited circumstances." *Miller v. Cty. of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006) (internal citation and quotation marks omitted). As set forth above, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez*, 853 F.2d at 77. "A county has no right to establish a policy concerning how [the district attorney] should prosecute violations of State penal laws." *Id*. Accordingly, a district attorney's misconduct in prosecuting an individual cannot give rise to municipal liability. *See Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) (citing *Baez*, 853 F.2d at 77). It is only where claims center on the administration or management of the district attorney's office that a district attorney may be found to have acted as a policymaker for purposes of § 1983 liability. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993); *Walker*, 974 F.2d at 301 ("Where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker.").

As discussed above, the claims Plaintiff is asserting against DA Fitzpatrick all involve actions taken by him in connection with the prosecution of the Hamer homicide, rather than in an administrative capacity. Therefore, the Court finds Plaintiff has failed to state a § 1983 *Monell* claim against Onondaga County with regard to the actions of DA Fitzpatrick.

To the extent Plaintiff seeks to hold the County of Onondaga liable for the actions of Dir. Corrado, the complaint also fails to state a claim. For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations"

that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases). Here, Plaintiff fails to allege any facts to show that Dir. Corrado acted pursuant to any municipal policy or custom.

Lastly, the Court finds the complaint lacks any allegations whatsoever that would support a *Monell* claim again the City of Syracuse. Rather, as noted above, Plaintiff's merely references this claim on the first page of the complaint.

Accordingly, in light of the foregoing, the Court recommends that Plaintiff's § 1983 *Monell* claims against the County of Onondaga and the City of Syracuse be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### G.      Whether to Permit Amendment

A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

In this case, it is not clear whether better pleading would permit Plaintiff to cure the deficiencies identified above. Nevertheless, out of deference to Plaintiff's *pro se* status, the Court recommends that he be granted leave to amend to cure the deficiencies identified above, except with regard to any claims against DA Fitzpatrick, ADA Dougherty, ADA Doran, ADA Ferrante, and AUSA Freedman, all of whom are entitled to absolute prosecutorial immunity.

**WHEREFORE**, based on the findings above, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**;[7] and it is further

**RECOMMENDED** that the Clerk be directed to provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 6), and notify that official that Plaintiff has filed this action and is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk is directed to revise the docket sheet to **ADD** the **CITY OF SYRACUSE** as a **DEFENDANT**; and it is further

**RECOMMENDED** that the complaint be **DISMISSED IN ITS ENTIRETY** as against Defendants Fitzpatrick, Dougherty, Doran, Ferrante, and Freedman; and it is further

**RECOMMENDED** that only Plaintiff's Section § 1983 fabrication of evidence claim against Defendants Proud, Lundborg, Nolan, Babbage, Collins, Galineu, Gossin, Kittel, Hilton, Quatrone, Corrado, Kreso, and Kurimsky in their individual capacities **SURVIVES** initial review and requires a response; and it is further

---

[7]  Section 1915 permits "an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged."  *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts."  *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)). Plaintiff should also note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's complaint otherwise be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated:  April 21, 2021
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[8]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 5:20-cv-01489-DNH-TWD    Document 10    Filed 04/21/21    Page 26 of 87
Myers v. Wollowitz, Not Reported in F.Supp. (1995)
1995 WL 236245

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,

v.

Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*
**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*
Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action

stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, \*3, 1994 U.S.Dist. LEXIS 17698, \*8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914, \*1, 1992 U.S.Dist. LEXIS 18864, \*2–3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in

1995 WL 236245

his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,

v.

COUNTY OF CAYUGA; Cayuga County Sheriff's
Department; City of Auburn; Shawn I. Butler, Chief
of Auburn Police Department, as an Individual
and in his official capacity; Cayuga County
District Attorney's Office; Jon E. Budelmann,
as an Individual and in his capacity as District
Attorney for Cayuga County; and Anthony
Spinelli, as an Individual and in his capacity
as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF
JARROD W. SMITH, 11 South Main Street, P.O. Box 173,
Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF
JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville,
New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO
FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER,
6575 Kirkville Road, East Syracuse, New York 13057,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

*1 On or about February 18, 2020, Plaintiff filed a complaint
against Defendants City of Auburn, Shawn L. Butler, County
of Cayuga, Cayuga County District Attorney's Office, Jon
E. Budelmann, and Anthony Spinelli, asserting eight claims
pursuant to 42 U.S.C. §§ 1983 and 1988, and state law.
*See* Dkt. No. 5. Specifically, Plaintiff's complaint alleges the
following causes of action: (1) false arrest under the Fourth
and Fourteenth Amendments; (2) malicious prosecution
under the Fourth and Fourteenth Amendments; (3) negligent
failure to train or supervise; (4) state law false arrest; (5)
state law false imprisonment; (6) intentional and negligent
infliction of emotional distress under New York State law;
(7) negligence; and (8) deliberate indifference to medical care
under the Eighth Amendment. *See* Dkt. No. 5 at ¶¶ 40-114.
Currently before the Court is Defendants' motion to dismiss
the complaint in its entirety. *See* Dkt. No. 9.

**II. BACKGROUND**

According to the complaint, on August 10, 2018, Plaintiff
was the passenger in a vehicle that was driven by 140 Wall
Street, allegedly in violation of an order of protection for
Linda Fitzsimmons and Lee Joyner, who both reside at that
address. *See* Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145
Wall Street, several houses down from 140 Wall Street, on the
opposite side of the street. *See id.* at ¶ 25. Plaintiff was not the
driver of the vehicle and had no control over how the driver
was delivering him to his home. *See id.*

On August 13, 2018, Plaintiff was arraigned on two felony
complaints charging him with two counts of Criminal
Contempt in the First Degree based on the alleged violation of
the order of protection. *See id.* at ¶ 22. At the conclusion of his
arraignment, Plaintiff was remanded to the Cayuga County
Jail. *See id.* Plaintiff claims that "Defendant police officer
lacked the requisite requirement of having probable cause to
arrest the Plaintiff; and did falsely arrest and imprison the
Plaintiff." *Id.* at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his
capacity as Cayuga County District Attorney, presented
Plaintiff's charges to a grand jury, which "No Billed" the case.
*See id.* at ¶ 26. At this point, Plaintiff was released from
custody. *See id.*

During the fifty-three days during which Plaintiff "was being
illegally imprisoned," he slipped and fell at the Cayuga
County Jail. *See id.* at ¶ 31. According to Plaintiff, on August
31, 2018, a water pipe burst at the Cayuga County Jail near
Plaintiff's cell while he was already locked in for the night
and sleeping. *See id.* at ¶ 32. Plaintiff was woken by a
bursting water pipe that was turned off by a Cayuga County
Correctional officer. *See id.* at ¶ 33. "The first burst of the
water pipe [occurred] when the Cayuga County Correctional

officer shut the water off" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

#### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w]' that the

pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

#### B. Documents Considered in Deciding Motion to Dismiss

In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, \*3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, \*4 (E.D.N.Y. Apr. 7, 2003) (considering incident report

and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's claim stands or falls, but which for some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*, No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only

to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

### C. *Monell* and Supervisory Liability

**\*4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or

custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted).[1]

[1] As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

### D. Cayuga County District Attorney's Office and Auburn Police Department

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rensselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

### E. False Arrest

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present

to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

**\*6** In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge

or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

[2]     Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the

public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

### F. Malicious Prosecution

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt. No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution. [3]

[3]    Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case,

not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.' " *Torres*

*v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### *1. Initiation of Criminal Prosecution*

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police official misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

### *2. Malice*

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### *3. Prosecutorial Immunity*

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " ' from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, \*3 (W.D.N.Y. June 22, 2017) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, \*3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses

'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, *4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at *4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983 liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d

Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress
In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial

probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

**H. Negligence**
In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the

appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

**I. Deliberate Indifference to Serious Medical Needs**
In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a *'mens rea' prong* or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing

Case 5:20-cv-01489-DNH-TWD  Document 10  Filed 04/21/21  Page 37 of 87
Joyner v. County of Cayuga, Slip Copy (2020)
2020 WL 1904088

*Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even

though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's

toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See* Connick, 131 S. Ct. at 1360; *see also* Plair v. City of New York, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); Giaccio v. City of New York, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. At best, the facts set forth in the complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

## IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**;[4] and the Court further

4       As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1904088

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban,
P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O.
Edward Simonetti, P.O. Matthew Boorman, P.O.
Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan;
P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

***MEMORANDUM OPINION & ORDER***

PAUL G. GARDEPHE, District Judge.

**\*1** Plaintiff Ronald Moye has brought claims against the City of New York, former New York County Assistant District Attorney Dustin Chao, and eight members of the New York City Police Department ("NYPD") under 42 U.S.C. § 1983 and state law. Moye claims that Chao is liable for damages under Section 1983 and state law for malicious prosecution, abuse of process, denial of a fair trial, fabrication of evidence, conspiracy "to inflict an unconstitutional injury," and intentional and negligent infliction of emotional distress. (Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Claims) Chao has moved to dismiss the Amended Complaint on grounds of absolute immunity. For the reasons stated below, Chao's motion to dismiss will be granted.

***BACKGROUND***

For purposes of deciding Defendant Chao's motion to dismiss, the Court has assumed that the following facts presented in the Amended Complaint are true.

**I. *MOYE'S ARREST***

On or about March 12, 2002, at approximately 8:00 p.m., NYPD officers Paul Jeselson and Tawaina O'Neal were stationed on the rooftop of an apartment building on the south side of West 118th Street near the corner of Morningside Avenue conducting nighttime narcotics surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located on the north side of West 118th Street, near Manhattan Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed Plaintiff "extend his hand from the driver's side window and hand a small glassine" to another individual—later arrested—who, in turn, handed it to an unapprehended customer. (*Id.* ¶ 20) The Defendant officers moved in and arrested Moye in the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the officers searched Moye and his car and found United States currency, both in Moye's possession and inside the vehicle. (*Id.* ¶ 27) The Defendant officers unnecessarily grabbed Moye, pushed him, and placed excessively tight handcuffs on him (*id.* ¶ 30), causing him to suffer bruises to and numbness in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal Possession of a Controlled Substance in the Third Degree. (Am. Cmplt.¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that the police officer defendants "conspired [to give] and gave false testimony and intentionally placed false evidence before the grand jury." [1] (Am.Cmplt.¶ 35)

[1]    The Amended Complaint does not disclose what false testimony or other false evidence was laid before the grand jury. Moreover, there is no suggestion that Chao was involved in presenting false testimony or false evidence to the grand jury.

**II. *MOYE'S FIRST TRIAL***

Moye's first trial began on January 14, 2003. (Schwartz Decl., Ex. B) A.D.A. Chao introduced photographs at trial which he claimed showed the position of Plaintiff s car as it was parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer Jeselson, and Officer Papa were present when a District Attorney's office photographer took these photos in June 2002 from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42, 44) Although the photographs were intended to convey the vantage point of the officers on the night of the arrest, they did not replicate the "nighttime conditions." (*Id.* ¶ 45) According to Moye, these photographs nonetheless showed that the officers could not have seen Plaintiff extend his hand from the driver's side window and pass a small glassine to another individual, because the driver's side could not be seen from the vantage point of the rooftop observation post, even with binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted

2012 WL 2569085

that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*

**\*2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers would have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

"[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

"And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—

"[DEFENSE counsel]: Mr. Chao is vouching for his witness.

"THE COURT: Overruled.

"[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE counsel]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

**\*3** "THE COURT: Overruled.

"[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken....

"[DEFENSE counsel]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Move,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

**IV. THE CHARGES AGAINST MOYE ARE DISMISSED**

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Move,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id. at 6.* The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

**DISCUSSION**

**I. IMMUNITY**

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity.[2]

[2]     Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d

75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

**\*4**  As the Second Circuit has explained:

Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).

By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

[t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111

S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

**A. *Legal Standard for Absolute Prosecutorial Immunity***
A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b)(6) motion where facts establishing the defense may be "gleaned from the complaint")). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.[3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

[3]    District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

**\*5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when

their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

> not retreated ... from the principle that acts undertaken by a prosecutor preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a

2012 WL 2569085

prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

**\*6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir.1986); *see also Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.1988) (*per curiam* ) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the

performance of their duties. *See Imbler,* 424 U.S. at 426–428.

*Dory,* 25 F.3d at 83. [4]

[4]    By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City,* No. 11 CV 0195 FB, 2012 WL 603561, at \*4 (E.D.N.Y.2012) (citing *Barbera v. Smith,* 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. *Id.* While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley,* 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that

Case 5:20-cv-01489-DNH-TWD Document 10 Filed 04/21/21 Page 45 of 87
Moye v. City of New York, Not Reported in F.Supp.2d (2012)
2012 WL 2569085

the existence of probable cause with respect to a particular
suspect is a significant factor to be used in evaluating the
advocatory nature of prosecutorial conduct." *Cousin v. Small,*
325 F.3d 627, 633 (5th Cir.2003); *accord Barbera,* 836 F.2d
at 99 (noting "that in each of the cases we have reviewed
where absolute immunity was upheld, some type of formal
proceeding had been commenced or was being commenced
by the challenged acts"); *see also DiBlasio v. Novello,* 344
F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether
absolute immunity should attach to a prosecutor ... we have
focused on the timing of the conduct at issue....") Thus, in
interpreting *Buckley,* the Second Circuit has distinguished
between "preparing for the presentation of an existing case,"
on the one hand, and attempting to "furnish evidence on which
a prosecution could be based," on the other hand, with only
the former entitling a prosecutor to absolute immunity. *Smith
v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

**\*7** In assessing a prosecutor's claim of absolute immunity,
the court employs a "functional approach," *see, e.g., Burns,*
500 U.S. at 486, which looks to "the nature of the function
performed, not the identity of the actor who performed it."
*Forrester v. White,* 484 U.S. 219, 229 (1988); *see also Van de
Kamp v. Goldstein,* 555 U.S. 335, 335–336 (2009) ("To decide
whether absolute immunity attaches to a particular kind of
prosecutorial activity, one must take account of ... 'functional'
considerations"). The court must inquire whether the actions
in question are part of a prosecutor's traditional function
and whether they are closely associated with the judicial
process. *Blouin v. Spitzer,* 356 F.3d 348, 357 (2d Cir.2004) (a
court must examine the "nature of the function performed"
in assessing whether absolute immunity will attach.); *Doe v.
Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

### B. *Analysis*

#### 1. *Malicious Prosecution, Abuse of Process*
To the extent that the Amended Complaint seeks to hold
Chao liable for initiating the prosecution of Moye, absolute
immunity is clearly applicable. *Shmueli v. City of New
York,* 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor
is shielded from liability for damages for commencing and
pursuing the prosecution, regardless of any allegations that
his actions were undertaken with an improper state of mind or
improper motive."); *see also Hill,* 45 F.3d at 660–61 (holding
that prosecutors and those working under their direction are
absolutely immune for claims relating to the initiation of a
prosecution and for conduct before a grand jury). Plaintiff s

federal and state law claims alleging malicious prosecution
and abuse of process will therefore be dismissed. [5]

5    Absolute immunity is a defense not only to Section
     1983 claims but to related state law claims. *See
     Shmueli,* 424 F.3d at 238 (dismissing Section
     1983 and related state law malicious prosecution
     claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112
     (E.D.N.Y.2004) (dismissing abuse of process and
     civil conspiracy claims on grounds of absolute
     prosecutorial immunity); *Imbler,* 424 U.S. at 424
     (same principles require conferral of absolute
     immunity for damage claims against prosecutors
     under Section 1983 and state law).

#### 2. *Creation of Misleading Photographs, Conspiracy to
Present False Evidence at Trial*
Moye alleges that Chao, in preparation for Moye's second
trial, returned to West 118th Street and instructed Nancy
Badger—the District Attorney's office photographer—to take
photographs that inaccurately represented the position of
Moye's car on the night of his arrest. Chao then presented
these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40,
50, 50–54, 66–67) Moye alleges that these photographs gave
the false impression that the police in the observation post
would have been able to see Moye's hand outside the driver's
side window. (*Id.* ¶ 60) Moye further argues that absolute
immunity does not extend to Chao's role in obtaining these
allegedly misleading photographs, because obtaining such
evidence is "not a traditional prosecutorial function" and was
"done for the purpose of misleading the second jury." (Pltf.
Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for
presentation of testimony," however, but also to preparatory
conduct "relating to their advocacy." *Dory,* 24 F.3d at 83.
The Supreme Court and the Second Circuit have emphasized
that ' "the duties of the prosecutor in his role as advocate
for the State involve actions preliminary to the initiation
of a prosecution and actions apart from the courtroom....
Preparation, both for the initiation of the criminal process
and for a trial, may require the obtaining, reviewing, and
evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting
*Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d
at 571 ("The absolute immunity accorded to government
prosecutors encompasses not only their conduct of trials
but all of their activities that can fairly be characterized as
closely associated with the conduct of litigation or potential
litigation....").

2012 WL 2569085

**\*8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at \*10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at \*5, \*11, \*13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at \*21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at \*30–\*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ...

conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

**\*9** Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

### 3. *Misconduct at Trial*
Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at \*4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony....' ' ") (citations omitted); *Bertuglia,* 2012 WL 906958, at \*23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at \*2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at \*2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff"); *see Imbler,* 424 U.S. at

430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard.* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at *3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at *2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express [ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

**\*10**  In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

\* \* \* \*

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

### *CONCLUSION*

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant
District Attorney Robert Henoch, Captain
of Corrections Martin, Corrections Officer
Schmidt, Corrections Officer Brown and
Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

**\*1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants. [1] Id. ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. Id. Johnson claims that he was being held in Beacon, a housing area on Rikers

Island, which was in "the same general area" as where the people against whom he was to testify were held and that he alerted ADA Henoch of this fact. Id. ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." Id. at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. Id. at 5.

[1]   The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." Id. As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. Id. ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." Id.

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See* Jamison v. Dee, 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

## I. *Absolute Immunity*

**\*2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,* 996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

## II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818). To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the

life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

**\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson.[2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action

in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, *3 (S.D.N.Y. Nov. 6, 1995) (citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

2      Johnson does not specify whether he is claiming
       defendant Henoch owed a duty to protect him based
       on the special relationship or state-created danger
       exception to the *DeShaney* rule. For the purpose of
       this motion, both arguments will be addressed.

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

> "[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect

an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2000 WL 1335865

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Guerrero v. Revans,   S.D.N.Y.,   February 24, 2020

2009 WL 1024261
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Zaher ZAHREY, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

Civil Action No. 98–4546 (DCP)(JCF).
|
April 15, 2009.

West KeySummary

1    **Conspiracy**  🔑 **Law enforcement and criminal
     prosecution; Fourth Amendment**

     **Conspiracy**  🔑 **Labor and employment**

     Detective did not demonstrate that city
     employees had an agreement to deprive detective
     of his civil rights, and therefore detective's
     motion for reconsideration of the grant of
     summary judgment in favor of city's employees
     in detective's civil conspiracy claim was denied.
     Detective alleged that city employees conspired
     to manufacture false or misleading evidence
     intended for use against detective in criminal or
     departmental disciplinary proceedings, to cause
     false arrest, malicious prosecution, and wrongful
     imprisonment, and to cause the termination
     of detective's position with the city. However,
     detective provided no evidence, absent the fact
     that individual city employees worked together,
     that such an agreement existed. 42 U.S.C.A. §
     1985.

     23 Cases that cite this headnote

**Attorneys and Law Firms**

Joel B. Rudin, for Plaintiff.

Michael Cardozo, Marilyn Richter, Corporation Counsel of
the City of New York, for Defendants.

*OPINION*

DONALD C. POGUE, District Judge.

**\*1**  [The court amends its January 7th order to recharacterize
Zahrey's right to a fair trial claim as an action for violation of
his right to procedural due process rooted in the Fifth, Sixth
and Fourteenth Amendments; Plaintiff's motion to reargue
partial grant of summary judgment is otherwise DENIED.]

POGUE, Judge: [1]  Plaintiff Zaher Zahrey ("Zahrey") moves
the court, under Local Civil Rule 6.3 and Federal Rule of
Civil Procedure 59(e), to reconsider and/or allow reargument
on the court's partial grant of summary judgment in favor
of Defendants. *See Zahrey v. City of New York*, No. 98–
4546(DCP)(JCF), 2009 WL 54495 (S.D.N.Y. Jan. 7, 2009)
(*"Zahrey"* or "January 7th order"). [2]

[1]   Judge Donald C. Pogue of the United States Court
      of International Trade, sitting by designation.

[2]   Familiarity with this prior opinion is presumed.
      In general terms, the court's January 7th order
      granted partial summary judgment in Zahrey's
      1998 civil action against various municipal and
      county entities and employees ("Defendants").
      Zahrey's action alleges that Defendants violated
      his constitutional rights by subjecting Zahrey to a
      criminal prosecution and a departmental trial based
      upon allegedly fabricated evidence. Specifically,
      Zahrey's complaint alleged violations pursuant to
      42 U.S.C. §§ 1981, 1983 and 1985, in addition to
      pendent state claims of malicious prosecution and
      negligent hiring and training.

The court's January 7th order denied Defendants' summary
judgment motion regarding the questioning and use at
Zahrey's trial of a witness, Sidney Quick ("Quick"). At
the same time, however, the court granted significant parts
of Defendants' summary judgment motion with regard to
Zahrey's remaining allegations against the Defendants. [3]

[3]   Individual Defendants moved for summary
      judgment on grounds of, among other things,
      lack of sufficient evidence, absolute and qualified

2009 WL 1024261

immunity, lack of proximate causation, collateral estoppel, and inability to establish a claim for state or federal malicious prosecution or any other constitutional tort. The City of New York and Kings County ("Municipal Defendants") and Howard Safir and Charles Hynes ("Official Defendants") did not move for summary judgment on the specific claims alleged against them, including negligent hiring and training.

Zahrey's current motion for reconsideration/reargument alleges five issues upon which Zahrey claims the court erred in its January 7th order: (1) recognition of a superseding cause of Zahrey's incarceration following revocation of his bail; (2) limitation of Zahrey's due process claims; (3) grant of summary judgment on Zahrey's claim of civil conspiracy; (4) grant of summary judgment to Defendants Little and Ponzi with regard to certain polygraph evidence; and (5) denial of trial with regard to Zahrey's allegation of special injury. For the reasons given below, the court amends its prior order to clarify its grant of summary judgment as to Zahrey's procedural due process fair trial claims, but otherwise DENIES Zahrey's motion.

### I. Standard of Review

Reconsideration of a judicial order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (citation omitted). Accordingly, in order to prevail in a motion for reconsideration or reargument, the moving party "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion," *Lichtenberg v. Besicorp Group Inc.,* 28 F. App'x 73, 75 (2d Cir.2002) (quoting *Fulani v. Brady,* 149 F.R.D. 501, 503 (S.D.N.Y.1993), *aff'd sub nam. Fulani v. Bentsen,* 35 F.3d 49 (2d Cir.1994)), that "might reasonably be expected to alter the court's decision." *Jones v. Donnelly,* 487 F.Supp.2d 418, 419 (S.D.N.Y.2007) (citing *Lichtenberg,* 28 F. App'x at 75). Alternatively, "[r]econsideration may be granted to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence." *Word v. Croce,* No. 01 Civ. 9614(LTS)(DFE), 2004 U.S. Dist. LEXIS 3643, at *7, 2004 WL 434038 (S.D.N.Y. Mar. 9, 2004) (quoting *Parrish v. Sollecito,* 253 P. Supp.2d 713, 715 (S.D.N.Y.2003)).

*2 "A court must narrowly construe and strictly apply [Local] Rule 6.3 [providing for reconsideration] so as to avoid duplicative rulings on previously considered issues and to prevent the rule from being used as a substitute for appealing a final judgment." *Jones,* 487 F.Supp.2d at 419 (citing *Shamis v. Ambassador Factors Corp.,* 187 F.R.D. 148, 151 (S.D.N.Y.1999); *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996)); *see also Word,* 2004 U.S. Dist. LEXIS 3643, at *7, 2004 WL 434038. Thus, a motion for reconsideration is not an opportunity for the moving party "to reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc.,* 914 F.Supp. at 1001.

Applying this standard, the court will consider, in turn, each of Zahrey's objections.

### II. Proximate Causation

Although Zahrey was originally granted bail in the criminal prosecution against him, U.S. Magistrate Judge Azrack subsequently revoked Zahrey's bail, resulting in a period of incarceration prior to trial. Zahrey seeks to hold Defendants liable for that incarceration. In its January 7th order, the court held that the bail revocation hearing testimony of Sidney Quick's mother, Hannah Quick—that Zahrey called her on the telephone and threatened her—broke the chain of proximate causation between Sidney Quick's allegedly fabricated evidence and Zahrey's bail revocation; thus, the court held that Zahrey could not hold Defendants liable for his incarceration subsequent to his bail revocation. *See Zahrey,* 2009 WL 54495, at *24,

Zahrey claims that the court overlooked four "controlling" principles of proximate causation. First, "[a] proximate cause determination does not require a jury to identify the liable party as the sole cause of harm, it only asks that the identified cause be a substantial factor in bringing about the injury." *Hydro Investors, Inc., v. Trafalgar Power Inc.,* 227 F.3d 8, 15 (2d Cir.2000). Second, if a decision-maker was pressured by Defendants or "influenced" by tainted evidence, the decision-maker's decision can neither be deemed independent of Defendants' wrongdoing nor a "superseding" cause. *Higazy v. Templeton,* 505 F.3d 161, 177 (2d Cir.2007). Third, Defendants' cannot allege superseding cause unless "the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct." *Id.* (quoting *Zahrey v. Coffey,*

Case 5:20-cv-01489-DNH-TWD    Document 10    Filed 04/21/21    Page 54 of 87
Zahrey v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 1024261

221 F.3d 342, 352 n. 8 (2d Cir.2000) ("*Coffey*" )). Fourth and finally, a plaintiff need not show that the defendant could "anticipate the precise manner of the accident or the exact extent of injuries ... where the general risk and character of injuries are foreseeable." *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666, 671 (N.Y.1980).

In applying these principles, Zahrey argues that Defendants relied upon Sidney Quick's testimony in convincing U.S. Magistrate Judge Azrack and U.S. District Judge Gershon that Hannah Quick testified truthfully.[4] Zahrey cites to *Higazy,* 505 F.3d at 175, and *Coffey,* 221 F.3d at 351–52, to emphasize that Hannah Quick's testimony could not have been an independent cause, because Quick's testimony "was used to influence the court's decision to revoke plaintiff's bail and to detain him through trial." Pl.'s Mem. in Supp. of His Mot. to Reargue Partial Grant of Summ. J. ("Pl.'s Mem.") 4. In particular, Zahrey insists that, given the inconsistencies in Hannah Quick's testimony,[5] Defendants were able to revoke Zahrey's bail only by heavily relying upon Sidney Quick's coerced testimony. Zahrey cites to Judge Azrack's comments during the hearing[6] and her subsequent judgment,[7] to demonstrate that the court, in revoking Zahrey's bail, did indeed heavily rely on Sidney Quick's stories. However, Zahrey references evidence already found by the court to be either unsubstantiated or covered by absolute immunity.[8] As such, the court will not entertain these particular arguments.

[4]    Zahrey characterizes this court's January 7th order as holding that "the magistrate judge's decision, whether correct or not, was an independent cause of plaintiff's damage, for which defendants are not responsible." Pl.'s Reply Mem. of Law in Supp. of His Mot. to Reargue Partial Grant of Summ. J. ("Pl.'s Reply") 1. As such, he complains that this court failed to correctly apply *Higazy* and *Coffey.* However, Zahrey misrepresents the court's proximate cause holding; the court instead held that the testimony of Hannah Quick broke the chain of causation. *See Zahrey,* 2009 WL 54495, at *24.

[5]    Despite having told Corrigan and Wirth that the threatening caller did not give his name, though she recognized the voice as Zahrey's—based on hearing his voice during a short meeting over two years earlier—Hannah Quick changed her story on the witness stand and said that the caller identified

himself as Zahrey. Defs.' Ex. on Their Mot. for Summ. J. ("Defs.' Ex.") 35 at 15; Defs.' Ex. 36 at 7. While testifying, she also mistakenly identified someone else as Zahrey. Defs.' Ex. 36 at 11, 36. When confronted with these inconsistencies by the court, Hannah Quick stated she was "so nervous." *Id.* at 65.

[6]    Zahrey points to Assistant U.S. Attorney Martin Coffey's October 30, 1996 letter to the court to revoke Zahrey's bail, asking the court to consider Hannah Quick's testimony as well as the allegations in the indictment. *See* Defs.' Ex. 34. In response to Zahrey's counsel's argument that a police officer such as Zahrey would never risk threatening the mother of a witness and give his name, Judge Azrack noted: "The government alleges very serious crimes against [Zahrey] and he allegedly committed them while he was a police officer. He's obviously, if you believe the government's charges, used to taking risks." Defs.' Ex. 38 at 12.

[7]    "[S]uch behavior as identifying himself would be entirely consistent with the defendant's apparent personality. Anyone such as the defendant who allegedly committed the charged crimes, while on the police force, would necessarily have to be an aggressive and arrogant risk taker.... Thus, I find this type of active intimidation consistent with his personality." Defs.' Ex. 38 at 26. U.S. District Judge Gershon upheld the Magistrate's revocation of bail, as the latter was entitled to rely on "the nature of the crimes of which plaintiff is accused." *United States v. Zahrey,* No. 96 CR. 910 (E.D.N.Y. Nov. 7, 1996) (order affirming revocation of bail).

[8]    Zahrey claims that Coffey and Corrigan, prior to offering Hannah Quick's testimony, argued to Judge Azrack that "there is such a serious risk here, considering the seriousness of the offenses, two homicides, acts of violence, his background as someone who uses influence and intimidation in trying to gain his way, that this Court should detain him." Defs.' Ex. 35 at 10. Zahrey argues, as he has previously, that Defendants intentionally failed to correct Hannah Quick's false testimony that she had no idea that Quick was cooperating with federal and state authorities in the Zahrey case. Additionally, Zahrey repeats his allegations that he has produced "overwhelming evidence

that defendants knowingly exploited testimony by Hannah Quick." Pl.'s Mem. 3. According to Zahrey, Hannah Quick's "fear" given her knowledge of her son's cooperation served as a motive for lying about the Zahrey telephone call, and Defendants knowingly hid this motive from the court. *Id* . 8–10. Zahrey also again points to taped telephone conversations between Quick and his mother while Quick was in jail, attempting to construe these conversations as evidence that Hannah Quick was convinced by her son that she needed to lie and claim that she was "threatened" in order to obtain relocation. *Id.* 10. Zahrey also faults the court for ignoring Defendants' withholding of exculpatory evidence during the bail revocation hearing: namely, the fact that Quick's testimony was "improperly manufactured." *Id.* 11.

**\*3** Nonetheless, Zahrey does present two grounds for rehearing on this issue that this court will address. He first urges that it was foreseeable to Defendants, when coercing Sidney Quick's statements, that Quick's testimony would be used in *any* bail-related proceeding. The Bail Reform Act, 18 U.S.C. § 3142(g), Zahrey insists, compelled the court to consider "the nature and circumstances of the offense charged," "the weight of the evidence against the person" and "the person's character"—all considerations which, according to Zahrey, involved reliance upon Quick's allegations. Zahrey also makes the argument one step further, and urges that it was reasonably foreseeable to Defendants, in improperly obtaining Quick's testimony, that "almost any event ... would result, in the context of Quick's allegations, in Zahrey's detention without bail." Pl.'s Mem. 6–7 (emphasis omitted). The court agrees it would be a reasonable inference that it was foreseeable to Defendants that, when allegedly coercing Quick, such testimony would be used to incarcerate Zahrey, whether pursuant to an initial bail hearing or after trial.

But the harm at issue here, i.e., incarceration following a subsequent bail revocation, hearing, is not similarly foreseeable. [9] In New York, a tortfeasor is liable when the tort victim "is harmed by an occurrence resulting from ['an unreasonable risk of harm arising from one or more particular foreseeable hazards']." *Di Ponzio v. Riordan,* 89 N.Y.2d 578, 657 N.Y.S.2d 377, 679 N.E.2d 616, 619 (N.Y.1997) (citing Restatement (Second) of Torts § 281, cmt. e & illus. 3 (1965)). "In contrast, 'where the harm was caused by an occurrence that was not part of the risk or recognized hazard involved in the actor's conduct, the actor is not liable.' " *Id.* The New York Court of Appeals further states:

[9]

As an initial matter, 18 U.S.C. § 3148, the section pursuant to which the bail revocation application was filed, does not necessarily compel consideration of a criminal defendant's charges. Section 3148(b) allows for, but does not compel, the court to consider the section 3142(g) factors:

> The judicial officer [in deciding whether to revoke a person's bail] shall enter an order of revocation and detention if, after a hearing, the judicial officer—
>
> (1) finds that there is—
>
> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>
> (B) clear and convincing evidence that the person has violated any other condition of release; and
>
> (2) finds that—
>
> (A) based on the factors set forth in section 3142(g) of this title [18 USCS § 3142(g) ], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; *or*
>
> (B) the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b) (emphasis added).

where an individual breaches a legal duty and thereby causes an occurrence that is within the class of foreseeable hazards that the duty exists to prevent, the individual may be held liable, even though the harm may have been brought about in an unexpected way. On the other hand, *no liability will result when the occurrence is not one that is normally associated with such hazards.*

*Id.* (emphasis added).

The Second Circuit emphasizes that "[t]he goal of the Court's § 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question," and " § 1983 damages should be made available only for risks that are 'constitutionally relevant.' " *Townes v. City of New York,* 176 F.3d 138, 148 (2d Cir.1999) (quoting John C. Jeffries, Jr., *Damages for Constitutional Violations: The Relation of Risk to Injury in Constitutional Torts,* 75 Va. L.Rev. 1461, 1475 (1989)). As the court concluded in its January 7th order, in allegedly procuring questionable testimony from Sidney Quick, Defendants risked violation

of Zahrey's Fourth Amendment and fair trial rights. Once released on bail, however, Hannah Quick's report to the police interfered with Zahrey's bail agreement with the government pending trial. After obtaining Quick's testimony and Zahrey's indictment, and agreeing to Zahrey's bail, Defendants' actions had ceased; the use of the tainted evidence came into playonly after a superseding cause effected its use. *See, e.g., Wray v. City of New York,* 490 F.3d 189, 193–95 (2d Cir.2007) (holding that an erroneous decision of a trial judge admitting legally inadmissible evidence broke the chain of causation); *Townes,* 176 F.3d at 147 (same) ("Townes does not plead conduct tantamount to malicious prosecution or false imprisonment. He alleges only a violation of his Fourth Amendment rights via an unreasonable seizure and search. By the time Townes was arraigned and filed his motion to suppress the handguns and cocaine, the defendants' allegedly tortious conduct had long since ended."). In *Townes* and *Wray,* similar to this case, independent acts, far removed from the defendants', resulted in the use of the allegedly tainted evidence. These independent acts were thus considered too remote from the original tortious act to permit liability. *See Wray,* 490 F.3d at 195 ("It is always possible that a judge who is not misled or deceived will err; but such an error is not reasonably foreseeable, or ... it is not the 'legally cognizable result' of an investigative abuse"); *Townes,* 176 F.3d at 147 ("The state trial court, which alone had the power to suppress the improperly obtained evidence, had control over the ultimate outcome of Townes's case").

**\*4** To draw the line with regard to liability, New York case law analyzes the foreseeability of the superseding act itself. To establish a prima facie ease of proximate cause, a plaintiff must show "that the defendant's negligence was a substantial cause of the events which produced the injury." *Maheshwari v. City of New York,* 2 N.Y.3d 288, 778 N.Y.S.2d 442, 810 N.E.2d 894, 898 (N.Y.2004) (quoting *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666, 670 (N.Y.1980)). Yet:

> [w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed. In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence.

*Derdiarian,* 434 N.Y.S.2d 166, 414 N.E.2d at 670. An intervening act may break the causal nexus when it is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct." *Id.; Maheshwari,* 778 N.Y.S.2d 442, 810 N.E.2d at 898. Such an intervening act " 'must be a new and independent force,' which was not 'set in motion by the defendant's own wrongful acts,' " *Lapidus v. State,* 57 A.D.3d 83, 866 N.Y.S.2d 711, 721 (N.Y.App.Div.2008) (quoting *Campbell v. Cluster Hous. Dev. Fund Co.,* 247 A.D.2d 353, 668 N.Y.S.2d 634, 635 (N.Y.App.Div.1998); *Mesick v. State,* 118 A.D.2d 214, 504 N.Y.S.2d 279, 282 (N.Y.App.Div.1986)), and must rise "to such a level of culpability as to replace the defendant's negligence as the legal cause." *Lapidus,* 866 N.Y.S.2d at 722.

Applying this New York authority to the facts alleged here, the court again concludes that Hannah Quick's report to the police that she received a telephone call, and her subsequent testimony to this effect, was not reasonably foreseeable. Contrary to Zahrey's assertions, he has provided no evidence to the court that Defendants played any part in causing the threatening telephone call, Hannah Quick's report to the police or her testimony. The court finds that her act—an act that was "independent" of Defendants' conduct and unforeseeable "in the normal course of events"—breaks the chain of causation.

Finally, determinations of legal or proximate cause involve attention to public policy. *Derdiarian,* 434 N.Y.S.2d 166, 414 N.E.2d at 670 ("the concept [of proximate cause] stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct"); *see also Lapidus,* 866 N.Y.S.2d at 722 ("the inquiry is also a policy driven one, aimed at determining 'whether the defendant's act, without which there would have been no harm to plaintiff, still bears a substantial nexus to the plaintiff's harm so as to constitute a proximate cause, or whether the intervening events have so attenuated the connection of defendant's act to the plaintiff's harm that fairness or policy dictate extinguishing defendant's liability' " (quoting *Lee S. Kreindler et al., New York Law of Torts,* § 8.1, at 397–98 (West Group 1997))); *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir.1994), Holding police officers and other government employees responsible for the actions of a

perjuring witness poses too great a risk to the operation of the law enforcement process. *See Waters v. N.Y. City Hous. Auth.,* 69 N.Y.2d 225, 513 N.Y.S.2d 356, 505 N.E.2d 922, 923–24 (N.Y.1987) ("The common law of torts is, at its foundation, a means of apportioning risks and allocating the burden of loss.... We are ... bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that 'the legal consequences of wrongs [are limited] to a controllable degree.' ") (citations omitted). [10] Even assuming that Hannah Quick did in fact lie to police about the telephone call, as noted in the court's January 7th order, courts will only impose liability on law enforcement for witness perjury when a plaintiff can demonstrate the perjury was in some part "attributable to the police." *Jenkins v. City of New York,* No. 98 Civ. 7170(JGK)(DFE), 1999 U.S. Dist. LEXIS 15353, at *24, 1999 WL 33932721 (S.D.W.Y. Sept. 29, 1999), *aff'd, No. 99–9304, 2000 U.S.App. LEXIS 12551, 2000 WL 730226 (2d Cir. June 6, 2000).* The court will not expand liability to police for Hannah Quick's actions absent evidence of this crucial link.

[10]   Because the court reaffirms that Hannah Quick's report to police and subsequent testimony broke the chain of proximate causation, it need not decide whether the evidence derived from Sidney Quick could reasonably be viewed as factually causing the U.S. Magistrate Judge to revoke bail and the U.S. District Judge to affirm that decision. Furthermore, as stated above, whether or not these federal judges were "independent decision makers," that is, made decisions independent of the influence of the indictment allegedly procured through Quick's testimony, is irrelevant to this particular question before the court.

**\*5** Although "questions concerning what is foreseeable and what is normal may be the subject of varying inferences [and thus] these issues generally are for the fact finder to resolve," where "only one conclusion may be drawn from the established facts ... the question of legal cause may be decided as a matter of law." *Derdiarian,* 434 N.Y.S.2d 166, 414 N.E.2d at 670; *accord Kerman v. City of New York,* 374 F.3d 93, 127 (2d Cir.2004). The latter cases "generally involve independent intervening acts which operate upon but do not flow from" the original tortious act. *Derdiarian,* 434 N.Y.S.2d 166, 414 N.E.2d at 670; *see also Kriz v. Schum,* 75 N.Y.2d 25, 550 N.Y.S.2d 584, 549 N.E.2d 1155, 1161 (N.Y.1989); *Marenghi v. N.Y. City Transit Auth.,* 151 A.D.2d 272, 542 N.Y.S.2d 542, 543 (N.Y.App.Div.1989) ("Intervening acts of

third persons do not necessarily prevent a recovery, and it is usually, but not always, a question for the jury whether the intervening act was foreseeable. But where the allegedly negligent act merely furnishes an occasion for an unrelated act producing an injury, and where the injury is not of the kind to be expected from the negligent act, it may be found that the act of a third party is a superceding cause as a matter of law." (citations omitted)), *aff'd,* 74 N.Y.2d 822, 546 N.Y.S.2d 337, 545 N.E.2d 627 (N.Y.1989) (mem.). This is such a case. Therefore, the court DENIES Zahrey's first ground for rehearing.

### *III. Due Process*

The court's January 7th order also held that "because the more specific Sixth Amendment fair trial claim lies, Defendants' motions for summary judgment on Zahrey's more generalized Fifth Amendment [substantive] due process claims must be GRANTED." *Zahrey,* 2009 WL 54495, at *25 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality); *see also Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Zahrey challenges this court's ruling in two ways, each of which must be rejected.

First, Zahrey argues that the court improperly and unfairly granted summary judgment *sua sponte* on this issue without warning. But in their summary judgment motion, Defendants contended that Zahrey could not establish a claim for any constitutional tort, including denial of substantive due process. [11] As such, the issue of whether Zahrey's evidence fabrication claim amounted to a Fifth Amendment substantive due process claim was fairly before the court. In any event, although it is "preferred practice" to allow parties notice to brief issues previous to granting summary judgment:

[11]   Defendants specifically moved for summary judgment on the grounds that:
> Plaintiff cannot establish a state or federal claim for malicious prosecution in connection with his criminal proceedings .... Nor can he establish any other constitutional tort in connection with his criminal proceedings.

Defs.' Factual Annotated Amended Mem. of Law in Supp. of Their Mot. for Summ. J. 29.

[w]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.... The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.

**\*6** *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir.1995) (internal citations omitted); *Pettus v. Horn,* No. 04 Civ. 459(WHP), 2005 U.S. Dist. LEXIS 20591, at \*13, 2005 WL 2296561 (S.D.N.Y. Sept. 21, 2005). Zahrey has not demonstrated to the court, nor can he demonstrate, that granting the court's order procedurally prejudiced him.

> A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to present evidence in support of its position. If, however, the party either cannot claim to have been surprised by the district court's action or if, notwithstanding its surprise, the party had no additional evidence to bring, it cannot plausibly argue that it was prejudiced by the lack of notice.

*Bridgeway Corp. v. Citibank,* 201 F.3d 134, 139–40 (2d Cir.2000) (internal citation omitted). Both parties have had ample time for discovery, and the evidentiary material adduced on this issue was before the court. Moreover, because the court ruled on a purely legal issue, Zahrey can point to no "additional evidence" that could bear on this matter; thus, "the threat of procedural prejudice that typically pertains to *sua sponte* action is not present in this case." *Tech. Express, Inc. v. FTF Bus. Sys. Corp .,* No. 99 Civ. 11692(GEL), 2000 U.S. Dist. LEXIS 18518, at \*11 (S.D.N.Y. Dec. 12, 2000). Accordingly, the court rejects Zahrey's first argument.

Second, Zahrey disputes the court's conclusion. He argues that, in *Coffey,* the Second Circuit did in fact characterize Zahrey's evidence fabrication claim as a Fifth Amendment

substantive due process claim. *See Coffey,* 221 F.3d at 349. Thus, Zahrey asks the court to allow both theories to go to the jury. In response, Defendants contend that the discussion of evidence fabrication in *Coffey* is distinguishable, in that the Second Circuit's analysis "centered around [Zahrey's] liberty deprivation" rather than malicious prosecution. [12] Defs.' Mem. of Law in Opp'n to Pl.'s Mot. to Reargue Partial Grant of Summ. J. ("Defs.' Mem.") 11.

[12]    Defendants would alternatively have the court dismiss the Fifth Amendment claims, as Defendants are state and local government actors. Zahrey responds that, as "federal actors," Corrigan and Wirth are potentially liable under the Fifth Amendment. Pl.'s Reply 9 n. 1. He also asserts that "[t]o the extent we seek to hold state actors liable for violating plaintiff's due process rights, we rely on either or both the Fifth and the Fourteenth Amendments." *Id.*

To the court, it is important to avoid confusion on this issue, Due Process, as provided in the Fifth and Fourteenth Amendments, is not always a clearly defined judicial principle. It has at least three aspects. As Justice Stevens explains:

[The Due Process Clause of the Fourteenth Amendment] is the source of three different kinds of constitutional protection. First, it incorporates specific protections defined in the Bill of Rights. Thus, the State, as well as the Federal Government, must comply with the commands in the First and Eighth Amendments; so too, the State must respect the guarantees in the Fourth, Fifth, and Sixth Amendments. Second, it contains a substantive component, sometimes referred to as "substantive due process," which bars certain arbitrary government actions "regardless of the fairness of the procedures used to implement them." Third, it is a guarantee of fair procedure, sometimes referred to as "procedural due process": the State may not execute, imprison, or fine a defendant without giving him a fair trial, nor may it take property without providing appropriate procedural safeguards.

**\*7** *Daniels v. Williams,* 474 U.S. 327, 337 (1986) (Stevens, J., concurring) (citations and footnotes omitted). Substantive due process, the most general of the Due Process protections, is often identified within the context of protecting certain fundamental rights (e.g., bodily integrity, marriage, procreation), *see Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality), or protecting

individuals from other arbitrary government behavior "so brutal and so offensive to human dignity" that it "shocks the conscience" of the court. *Rochin v. California,* 342 U.S. 165, 172, 174, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Two of Zahrey's causes of action are placed at issue by his motion for rehearing. In his complaint, regarding Defendants' alleged violations of section 1983, Zahrey claims:

Defendants operated, *inter alia,* to deprive Plaintiff of his rights under the Constitution and the laws of the United States: ...

(c) Pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, not to have false, misleading or inherently unreliable "evidence" manufactured, fabricated, or created, through the use of bribery, coercion, suggestion or other improper interrogation techniques, for the purpose of using such "evidence" against him in connection with the criminal or departmental disciplinary investigations and/or proceedings, and/or

(d) Not to be arrested, indicted, prosecuted or detained through the knowing use of false, fabricated, misleading, or inherently unreliable "evidence," or upon the testimony or statements of witnesses who had been illegally bribed, coerced or improperly influenced for their testimony or statements, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments [and] the right to a fair trial under the Fifth, Sixth and Fourteenth Amendments .... [13]

[13]    Zahrey's (d) cause of action originally stated that Defendants violated his right:

Not to be arrested, indicted, prosecuted or detained through the knowing use of false, fabricated, misleading, or inherently unreliable "evidence," or upon the testimony or statements of witnesses who had been illegally bribed, coerced or improperly influenced for their testimony or statements, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments, the right to grand jury indictment under the Fifth and Fourteenth Amendments, the right to a fair trial under the Fifth, Sixth and Fourteenth Amendments, the right to reasonable bail under the Fifth, Eighth and Fourteenth Amendments, the right to be free

of unreasonable search and seizure under the Fourth and Fourteenth Amendments, and 18 U.S.C. §§ 201(c)(2), 1001, 1503(a), 2 and 371. Fifth Amended Compl. ¶ 369. Individual Defendants moved for summary judgment on, and the court accordingly disposed of, Zahrey's allegations of violations of his rights to a grand jury indictment, to reasonable bail, and to be free from unreasonable search and seizure. These holdings have not been challenged. The latter allegation for false arrest was dismissed, in addition to Zahrey's more general false arrest cause of action for the violation of his right "[n]ot to be deprived of his liberty or property or to be arrested, detained or imprisoned except upon probable cause," *id.,* because it was subsumed within Zahrey's cause of action for malicious prosecution. *Zahrey,* 2009 WL 54495, at *24; *see Townes v. City of New York,* 176 F.3d 138, 149 (2d Cir.1999) (quoting *Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995).

Fifth Amended Compl. ¶ 369.

In its January 7th order, the court dismissed (c) as a duplicative substantive due process cause of action that was subsumed in Zahrey's other more specifically-alleged constitutional violations. *Zahrey,* 2009 WL 544 95, at *25. The court, however, also refused to grant summary judgment as to Zahrey's fair trial claims in (d). *Id.* The court couched the "fair trial" violation as pursuant to the Sixth Amendment, *id.* at *24–25, although this right originates in the Fifth or Fourteenth Amendment right to procedural due process. *See Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"); *United States v. Monsanto,* 924 F.2d 1186, 1190 (2d Cir.1991) (en banc); *see also Albright,* 510 U.S. at 273–74 n. 6 (plurality); *Senra v. Cunningham.,* 9 F.3d 168, 173 (1st Cir.1993) (claim of " 'distortion and corruption of the process of law,' such as 'falsification of evidence or some other egregious conduct resulting in a denial of a fair trial' " constitutes procedural due process claim); *Barrett v. United States,* No. 76 Civ. 381(CBM), 1986 WL 14973, at *6 (S.D.N.Y. Dec.15, 1986) (" 'common sense' dictates that allegations of corrupt judicial conspiracy to deprive plaintiff of property without due

2009 WL 1024261

process by thwarting [his] right to a fair trial is a matter of procedural, not substantive, due process" (quoting *Holloway v. Walker,* 784 F.2d 1287, 1293 (5th Cir.1986))); *cf. Rutledge v. County of Sonoma,* No. C 07–4274 CW, 2008 U.S. Dist. LEXIS 51313, at *12–13, 2008 WL 2676578 (N.D.Cal. July 1, 2008). Given this relationship, the court amends its January 7th order to recharacterize Zahrey's procedural due process right to a "fair trial" as stemming from both the Sixth as well as the Fifth and/or Fourteenth Amendments.

 **\*8** Zahrey's alleged procedural due process "fair trial" claim addressed in (d) fits squarely within the Second Circuit's holding in *Coffey:* "there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." *Coffey,* 221 F.3d at 344; [14] *see also Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997) ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.' ... When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.") (internal citations omitted). [15] As the court found sufficient evidence to sustain a cause of action on the elicitation and use of Quick's testimony, the court accordingly denied Defendants summary judgment on this cause of action. Neither party has challenged this holding.

[14]    Although the U.S. Supreme Court has considered a similar cause of action, involving fabrication of evidence and bribery of witnesses, to fall under the Fourth Amendment, *see Albright,* 510 U.S. at 274–75 (plurality), the Second Circuit has characterized this right as a procedural due process violation. *See Coffey,* 221 F.3d at 348–49. Of course, as the Supreme Court noted, the *Albright* plaintiff did not assert a claim for procedural due process. *Albright,* 510 U.S. at 271 (plurality). Because evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process.

[15]    Notably, at least in this circuit, such a section 1983 action for a violation of the right to "fair trial" would apparently lie even if a criminal defendant's charges were dismissed prior to trial. *See, e.g., Ricciuti,* 124 F.3d at 127, 130; *Douglas v. City of Mew York,* 595 F.Supp.2d 333, 346–47 (S.D.N.Y.2009).

However, with respect to (c) as well as Zahrey's remaining (d) cause of action, the court is unpersuaded by Zahrey's motion. Zahrey argues that the court incorrectly dismissed (c). But this particular cause of action does not pertain to the *procedural* due process violations addressed in *Coffey.* Instead, Zahrey's action here must fairly be described as an action for *substantive* due process, as he is not contesting the use of the Quick evidence in the criminal proceedings, rather he is simply contesting the evidence's *creation with the intent for such use,* regardless of the ensuing constitutional deprivation. Because of Zahrey's limited circumscription of (c), it is doubtful whether the Second Circuit would even consider (c) to have stated a claim upon which relief should be granted. *See Coffey,* 221 F.3d at 348 ("The manufacture of false evidence, 'in and of itself,' ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right"), 352 ("it would be as artificial to focus only on the act of using the evidence, without regard to the consequences of such use, as it would be to focus on the earlier act of fabrication, without regard to the consequences of that act. The use of fabricated evidence, unaccompanied by such consequences, no more impairs liberty than does the initial fabrication of evidence, unaccompanied by such consequences"), 354 ("We agree ... that the investigatory act of obtaining evidence known to be false is not itself a violation of a constitutional right. But we disagree with the further point that no valid section 1983 claim is stated where a deprivation of liberty *results* from the initial act of obtaining evidence known to be false" (emphasis in original)).

 **\*9** In any event, no general substantive due process claim lies. As the court stated before,"[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " *Albright,* 510 U.S. at 273 (plurality) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *County of*

*Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1996); *Tenenbaum v. Williams,* 193 F.3d 581, 599 (2d Cir.1999); *see also Maliha v. Faluotico,* 286 F. App'x 742, 744 (2d Cir.2008); *Russo v. City of Bridgeport,* 479 F.3d 196, 208 (2d Cir., 2007). Zahrey's allegations center on the coercion of Quick in order to (1) deprive him of his liberty without probable cause and (2) deprive him of a fair trial. The former right is covered by the Fourth Amendment, [16] *see Maliha,* 286 F. App'x at 744 ("Maliha's substantive due process claim thus merges with his Fourth Amendment claim because the former claim arises from the same set of actions that allegedly violated his Fourth Amendment rights; Maliha himself relies extensively on Faluotico's purported falsifications as evidence that probable cause was lacking"); *Russo,* 479 F.3d at 208–09, the latter by the procedural due process right to a fair trial provided by the Fifth, Sixth and Fourteenth Amendments. *See Riciutti,* 124 F.3d at 130; *Abreu v. City of New York,* No. 04–CV–1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *16–17, 2006 WL 401651 (E.D.N.Y. Feb. 22, 2006). The court cannot find, nor has Zahrey presented the court with examples of, any decisions from courts in this circuit which treat evidence fabrication as a denial of substantive due process. Hence, pursuant to *Albright,* Zahrey's (c) cause of action was properly dismissed.

[16]  In his plurality opinion, former Chief Justice Rehnquist provided a general conceptualization of the Fourth Amendment's protections: "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Albright,* 510 U.S. at 274 (plurality). Justice Ginsburg, however, espoused a broader reach for the Fourth Amendment's protection against "seizure." *Id.* at 278–79 (Ginsburg, J., concurring) ("A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense. A defendant incarcerated until trial no doubt suffers greater burdens. That difference,

however, should not lead to the conclusion that a defendant released pretrial is not still 'seized' in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence 'seized' for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court ."); *accord id.* at 289–90 (Souter, J., concurring); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 115 & n. 4, 116–17 (2d Cir.1995). As noted in the court's previous order, the Second Circuit has followed the broader Ginsburg approach. "[R]equirements of attending criminal proceedings and obeying the conditions of bail suffice" to constitute "seizure." *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003) (citing *Murphy v. Lynn,* 118 F.3d 938, 946 (2d Cir.1997)). Accordingly, consistent with this circuit's jurisprudence, Zahrey remained continually protected, by the Fourth Amendment, from the allegedly fraudulently-procured indictment that caused his initial arrest through his acquittal and release from jail.

As to Zahrey's allegations in (d) that he suffered a violation "of the Due Process Clauses of the Fifth and Fourteenth Amendments," Zahrey has not explained whether this involves violations of his substantive or procedural due process rights. In either case, however, this allegation was properly dismissed. If this were an alleged procedural due process claim, the court considers Zahrey's stated violations of fair trial procedural due process, pursuant to "the Fifth, Sixth and Fourteenth Amendments," and procedural violations of "Due Process Clauses of the Fifth and Fourteenth Amendments," as coextensive, at least in the context of this case. As such, the latter is dismissed as duplicative of the former. *See Gill v. City of New York,* 02 Civ. 10201(RWS), 2004 U.S. Dist. LEXIS 6481, at *30–31, 2004 WL 816449 (S.D.N.Y. Apr. 16, 2004) (dismissing general due process claims as they had already been considered under an another cause of action using due process analysis, which the court considered to be "identical"); *cf. Dawkins v. Williams,* 413 F.Supp.2d 161, 176 n. 11 (N.D.N.Y.2006) (dismissing Fifth Amendment due process violation as duplicative of asserted Fourteenth Amendment violation), *rejected in part on other grounds,* 511 F.Supp.2d 248, 251 (N.D.N.Y.2007); *Cimino v. Glaze,* 228 F.R.D. 169, 173 (W.D.N.Y.2005) (same). If the claim were one for substantive due process,

2009 WL 1024261

for the same reasons as explained above regarding Zahrey's (c) claim, the court would dismiss the allegation pursuant to *Albright.*

**\*10**  Accordingly, the court's January 7th order is amended to recharacterize the right to "fair trial," under the Fifth, Sixth and Fourteenth Amendments; however, Zahrey's motion as to due process is in all other respects DENIED.

### IV. Civil Conspiracy

Zahrey additionally moves for reconsideration on this court's holding regarding civil conspiracy. According to Zahrey, the court mischaracterized his claim of civil conspiracy to deprive him of his constitutional rights. Zahrey insists that, instead, Defendants conspired to

> manufacture or cause the manufactur[e] of false or misleading "evidence" intended for use against plaintiff in criminal or departmental disciplinary proceedings, to cause the false arrest, malicious prosecution, and wrongful imprisonment of plaintiff, and to cause the termination and/or modification of plaintiff's position as a detective ....

Pl.'s Mem. 14 (quoting Fifth Amended Compl. ¶ 366). In order to accomplish this conspiracy, Zahrey argues, Defendants

> made complaints to cause plaintiff's wrongful criminal and departmental prosecution, manufactured false evidence for that purpose, and used improper interrogation techniques for that purpose, among other things. [17]

[17]  Zahrey specifically alleges that an implicit agreement can he inferred given that: (1) Officer Boyce opened and initially was the Internal

Affairs Bureau ("IAB") detective in charge; (2) KGDAO Assistant District Attorney Guria arranged for Boyce to question Quick outside his attorney's presence, worked with Boyce during the investigation, served as Corrigan's supervisor and stayed up-to-date on the investigation; (3) Officers Boyce and McWilliams conducted the taped Quick interrogation together at Sing Sing Prison, after which Boyce gave the tape to Guria; (4) Wirth presented Zahrey's case to NYPD and the U.S. Attorney's Office; (5) KCDAO Assistant District Attorneys Corrigan and Guria, and Officers Wirth, Boyce and McWiliams, repeatedly met with the U.S. Attorney to encourage Zahrey's prosecution; (6) Wirth testified before the grand jury against Zahrey; (7) Corrigan, Wirth and McWilliams conducted follow-up interviews with Quick, and Corrigan and Wirth threatened Quick with prosecution and/or made him promises in order to obtain his grand jury and trial testimony; and (8) Corrigan, Wirth, Boyce, McWilliams and Guria intentionally withheld the Quick interview tape from Coffey. *Id.* 16–17. The court notes that, in its January 7th order, it granted Defendants summary judgment, for insufficient evidence, on Zahrey's claims that any Defendant intentionally withheld the tape of Zahrey's Sing Sing interview from prosecutors. *Zahrey,* 2009 WL 54495 at \*16– 17.

*Id.* 15. These allegations allow Zahrey to survive summary judgment, Zahrey further argues, because the conspiracy can be shown with indirect and circumstantial evidence. *See LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995) (civil conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct' " (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)); the conspirators need be shown only to "share the general conspiratorial objective" (quoting *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir.1990))). *See also Rubin,* 844 F.2d at 984 (criminal conspiracy may be shown by "circumstantial evidence"); *United States v. Downing,* 297 F.3d 52, 57 (2d Cir.2002) (as long as he understands the "essential nature of the plan," criminal conspirator need not know "details" or participants in conspiracy (quoting *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947))); *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.1980) (re a criminal conspiracy: "It is a rare

case indeed where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel. A conspiracy by its very nature is a secretive operation.").

Zahrey thus concludes that, since the court has found that all Individual Defendants (save Welsome, Hawkins, Little and Ponzi) survive summary judgment on the interrogation and use of Quick's testimony at trial, the court should allow the inference that these Defendants conspired to deprive Zahrey of his constitutional rights. Defendants respond that, although the Individual Defendants worked on the Zahrey investigation at different times and in different roles, this does not assert a claim for conspiracy.

 **\*11** The court will not grant Zahrey rehearing or reargument on his claim of civil conspiracy. In order to survive summary judgment, Zahrey must present more than "conclusory assertions of conspiracy." *Gil v. County of Suffolk,* 590 F.Supp.2d 360, 361 (E.D.N.Y.2008) (noting that plaintiff "offers no more than vague and conclusory assertions of conspiracy, which are not even sufficient to withstand a motion to dismiss." (citing *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990))). To establish such a conspiracy, a plaintiff must "provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the [violation of plaintiff's constitutional rights]." *Farag v. United States,* 587 F.Supp.2d 436, 470 (E.D.N.Y.2008) (emoting *Homer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (internal quotation marks omitted) (citing *Ting v. United States,* 927 F.2d 1504, 1512 (9th Cir.(1991)); *see also Robinson v. Allstate,* 584 F.Supp.2d 617, 620 (W.D.N.Y.2008) ("Where ... a plaintiff asserts that defendants have conspired to violate his constitutional rights under 42 U.S.C. § 1985, the '[p]laintiff must provide some factual basis supporting meeting of minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " (quoting *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003) (internal quotation marks omitted))). A meeting of the minds is difficult to directly prove and may be inferred from circumstantial evidence. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 240 (2d Cir.1999). "However, 'innuendo, unrelated incidents and conclusory allegations, without any factual basis' are insufficient to support a conspiracy claim." *Feacher v. Intercontinental Hotels Group,* 563 F.Supp.2d 389, 400 (N.D.N.Y.2008) (quoting *Adler v. Pataki,* 204 F.Supp.2d 384, 396 (N.D.N.Y.2002)). Zahrey must provide more evidence

than that Individual Defendants agreed to question witnesses or detain Zahrey—he must establish some factual basis to show that Defendants conspired to deprive him of his rights.

Unfortunately, Zahrey provides no evidence, absent the fact that the Individual Defendants worked together, that such an agreement existed. *See Farag,* 587 F.Supp.2d at 470–71 ("Plaintiffs, however, have adduced no evidence whatsoever of a 'meeting of the minds' whose *conscious objective* was to deprive plaintiffs of their constitutional rights; that Smith and Plunkett presumably had a 'meeting of the minds' when they *agreed to detain plaintiffs* is insufficient" (emphasis in original)); *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 792 (2d Cir.2007) (letter written between Board members did not "support a fact-finder's conclusion that the three members of the Board (whose comments would permit a jury to find that they *individually* acted with racial animus) had an understanding among themselves to do so." (emphasis in original)); *Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998) ("several telephone calls and other communications" only amounted to show "that Mei and O'Rorke cooperated with Almenas's investigation into Scotto's alleged parole violation"); *San Filippo v. U.S. Trust Co.,* 737 F.2d 246, 256 (2d Cir.1984) ("at no point in the proceedings has plaintiff alleged one shred of evidence in support of his conclusory assertion of conspiracy, beyond the fact that A.D.A. Crosson and Detective Woike met with defendants prior to their grand jury testimony. We see nothing suspicious or improper in such meetings, which are routine and necessary in the preparation of evidence."). As such, Zahrey's motion on this issue is DENIED.

## V. Little and Ponzi

 **\*12** Next, Zahrey challenges the court's dismissal of his claims against Douglas Little and Joseph Ponzi because prosecutors never used, before the grand jury or at Zahrey's trial, Little's and Ponzi's polygraph evidence—evidence that was allegedly fraudulently-created from interviews with Quick. According to Zahrey, simply creating and showing Quick's polygraph to prosecutors suffices, and no use in the judicial process is needed to hold Little and Ponzi responsible for malicious prosecution or constitutional torts.

Zahrey's motion on this issue is DENIED. Zahrey's evidence reflects no more than possible negligence on the parts of Little and Ponzi. Negligence cannot support a constitutional tort or a malicious prosecution claim. *See Bryant v. Maffucci,* 923

F.2d 979, 984 (2d Cir.1991); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 n .1 (2d Cir.1988); *see also Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003).

Moreover, as stated before, it is both the creation *and* the use of fabricated evidence that caused Zahrey constitutional harm. *See Coffey,* 221 F.3d at 352. The constitutional deprivations about which Zahrey complains center around Defendants' deprivations of his pretrial liberty without probable cause and his procedural due process right to a fair trial. Quick's polygraph neither caused nor contributed to these deprivations. *See id.* ("it would be as artificial to focus only on the act of using the evidence, without regard to the consequences of such use, as it would be to focus on the earlier act of fabrication, without regard to the consequences of that act. The use of fabricated evidence, unaccompanied by such consequences, no more impairs liberty than does the initial fabrication of evidence, unaccompanied by such consequences. For example, in Zahrey's case, his liberty was not impaired until, after the evidence was both fabricated and used by introducing it in evidence before the grand jury, an indictment was later returned and Zahrey was later arrested,").

As to Zahrey's state malicious prosecution claim, Zahrey can only rebut the indictment's presumption of probable cause by presenting evidence sufficient for a reasonable jury to find "that *the indictment was produced* by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006) (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1251 (N.Y.1983)) (emphasis added). "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially [.]' " *Rothstein v. Carriere,* 373 F.3d 275, 284 (2d Cir.2004) (quoting *Colon,* 468 N.Y.S.2d 453, 455 N.E.2d at 1250)). [18]

[18] Zahrey references former Chief Judge Sol Wachtler's famous comment that a grand jury, at the behest of a prosecutor, would indict a "ham sandwich." *See United States v. Navarro–Vargas,* 408 F.3d 1184, 1195 (9th Cir.2005) (en banc) (citing *In re Grand Jury Subpoena of Stewart,* 144 Misc.2d 1012, 545 N.Y.S.2d 974, 977 n. 1 (N.Y.Sup.Ct.1989), *aff'd as modified,* 156 A.D.2d 294, 548 N.Y.S.2d 679 (N.Y.App.Div.1989)). The court declines Zahrey's invitation to question the

integrity of the grand jury indictment process without being presented significant evidence to support this proposition. *Cf. United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (declaring that the grand jury acts as an important "buffer" between the government and the prosecution); *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) ("To allow ... the court [ ] to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure.... This underlying principle is reflected by the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form."). In this circuit and in the State of New York, the grand jury is presumed to have acted "regularly" and "judicially." *Rothstein,* 373 F.3d at 284; *Colon,* 468 N.Y.S.2d 453, 455 N.E.2d at 1250 (The presumption of probable cause created by an indictment "is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly.").

Zahrey points to *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir.1988), and *Robinson v. Maruffi,* 895 F.2d 649 (10th Cir.1990), for the proposition that fabricating evidence that simply affects a prosecutor's decision to prosecute, without more, amounts to actionable conduct. However, as noted by the Defendants, in *Jones* and *Robinson,* unlike the facts of Zahrey's case here, both pieces of evidence at issue were indeed presented to the grand jury or in other criminal proceedings. *See Jones,* 856 F.2d at 989–91 (among other things, the prosecutor testified falsely that victim provided solid identification of Jones as perpetrator, and a fabricated police report indicating that victim and others had identified Jones and provided other information was used to persuade the court to set bail at $250,000, which Jones could not afford; police also withheld exculpatory evidence from prosecutors, Jones, and Jones's attorney during trial in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)); *Robinson,* 895 F.2d at 653, 655–56 (bribed witness testified before the grand jury and Robinson was indicted).

**\*13** Zahrey also complains that it would be unfair to allow Defendants to rely on the polygraph in defending this action, while depriving Zahrey of his respective

malicious prosecution claim. However, Zahrey remains free to challenge the remaining Individual Defendants' reasonable reliance upon the polygraph in choosing to prosecute Zahrey, the reliability of which the U.S. Supreme Court and many scientific authorities have questioned. *See, e.g., United States v. Scheffer,* 523 U.S. 303, 309–12, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

### VI. *Special Injury*

Finally, Zahrey argues that the court's January 7th order granting Defendants summary judgment as to "special injury" was based on errors of law and fact. Zahrey likens his alleged "disgrace in the department" and temporary denial of backpay, following his suspension without pay, to "provisional" remedies mentioned in *Engel v. CBS, Inc.,* 93 N.Y.2d 195, 689 N.Y.S.2d 411, 711 N.E.2d 626, 631 (N.Y.1999) (citing *Groat v. Town Bd. of Glenville,* 73 A.D.2d 426, 426 N.Y.S.2d 339, 341 (N.Y.App.Div.1980)). Zahrey emphasizes that the *Groat* court found the requisite "special injury" even though the officer plaintiff had won his case and had been restored to the payroll prior to filing his civil lawsuit. *See Groat,* 426 N.Y.S.2.d at 340. Zahrey also points to cases that, he argues, stand for the proposition that suspension without pay plus disgrace in the department suffice to show "special injury." *See, e.g., First Merchant Bank OSH, Ltd. v. Village Roadshow Pictures (U.S.A.) Inc.,* No. 01 CIV. 8370(GEL), 2002 WL 1423063 (S.D.N.Y. June 28, 2002); *Campion Funeral Home., Inc. v. State,* 166 A.D.2d 32, 569 N.Y.S.2d 518 (N.Y.App.Div.1991), *appeal denied,* 78 N.Y.2d 859, 575 N.Y.S.2d 455, 580 N.E.2d 1058 (N.Y.1991); *Fulton v. Ingalls,* 165 A.D. 323, 151 N.Y.S. 130 (N.Y.App.Div.1914). Furthermore, Zahrey argues that a reasonable fact-finder could infer that he was "disgraced in the department," given he was subject to numerous press releases issued by the NYPD Commissioner and he was kept on modified status for three years.

Defendants point out that most of Zahrey's alleged injuries arose from his criminal trial, not the departmental proceedings. According to Defendants, the former injuries, which are not "related causally to alleged tortious acts [i.e., the departmental trial]," *Lincoln First Bank v. Siegel,* 60 A.D.2d 270, 400 N.Y.S.2d 627, 633 (N.Y.App.Div.1977), may not serve as "special injuries" related to Zahrey's departmental trial. Defendants also argue that Zahrey's post-bail-revocation incarceration caused Zahrey's suspension without pay.

In accordance with New York Civil Service Law § 75(3), [19] Zahrey was suspended without pay for up to thirty days incident to the filing of his criminal and disciplinary charges; Defendants argue that, had Zahrey not had his bail revoked, he would have returned to work at full pay on modified assignment after the expiration of thirty days. Defendants note that Zahrey has cited no cases where the imposition of a statutory suspension without pay, for which he was later compensated, coupled with a modified assignment at full pay, constitute "special injury." If it were, Defendants argue, any civil servant brought up on disciplinary charges which result in statutory suspension, and then acquitted, would be able to assert a state claim for malicious prosecution. Such would be contrary to the policy behind the special damages requirement. *See Engel,* 689 N.Y.S.2d 411, 711 N.E.2d at 629 ("malicious prosecution claims are not encouraged" (citing *Ferguson v. Arnow,* 142 N.Y. 580, 37 N.E. 626 (N.Y.1894)), and the law should avoid "ad infinitum [litigation] with each party claiming that the opponent's previous action was malicious and meritless" (quoting *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324, 1328 (N.Y.1984))).

[19]    New York Civil Service Law § 75(3–a) states that a police officer subject to disciplinary charges may be suspended without pay for up to thirty days. Section 75(3) provides that, if acquitted, a civil servant receives back pay for his period of suspension. Section 75 applies to NYPD Commissioner's revocation of an officer's detective designation. *See* N.Y. City Admin. Code § 14–103(e), *available at* http:// public.leginfo.state.ny.us/menugetf.cgi? COMMONQUERY=LAWS.

 **\*14** The court DENIES this final ground for reargument, A plaintiff may only demonstrate "special injury" by identifying a "highly substantial and identifiable interference with person, property, or business" involving "some concrete harm that is considerably more cumbersome than physical, psychological or financial demands of defending a lawsuit." *Id.* at 631. [20] Concomitant with the October 24, 1996 filing of Zahrey's disciplinary charges, Defs.' Ex. 65, Zahrey was, pursuant to New York law, suspended for up to thirty days. [21] Pl.'s Ex. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Ex.") D at ¶ 26. Zahrey was also released as per a bail agreement with the government on October 24. *See* Defs.' Ex. 33. Before the expiration of the thirty days, U.S. Magistrate Judge

Azrack revoked Zahrey's bail on November 5. *See,* Defs.' Ex. 38. Thus, pursuant to section 75(3), Zahrey was actually suspended approximately twelve potential work days before being jailed pending trial. Upon criminal acquittal on June 27, 1997, Zahrey remained on modified status at the automobile impound lot, and NYPD delayed giving Zahrey his backpay pending the outcome of his departmental proceeding in May 2000—in total, almost three years. Pl.'s Ex. D at ¶¶ 32–37; Defs.' Ex. 66. In all, Zahrey alleges (1) damage to his reputation by press releases and articles, (2) suspension for twelve days pursuant to section 75(3) prior to his bail revocation, (3) denial of suspension back pay for almost three years, and (4) remaining on modified assignment at the automobile impound lot for three years at full salary.

20    *Engel* derived from a long line of New York Court of Appeals case law limiting civil malicious prosecution actions. *See, e.g., Williams v. Williams,* 23 N.Y.2d 592, 298 N.Y.S.2d 473, 246 N.E.2d 333, 335 (N.Y.1969); *Burt v. Smith,* 181 N.Y. 1, 73 N.E. 495, 496 (N.Y.1905) ( "Damages are rarely recovered, however, for the malicious prosecution of a civil action, unless person or property is interfered with by some incidental remedy, such as arrest, attachment, or injunction."); *Willard v. Holmes, Booth & Haydens,* 142 N.Y. 492, 37 N.E. 480 (N.Y.1894) ("where a party has been subjected to some special or added grievance, as by an interference with his person, or property, in a civil action, brought without probable cause, he may maintain a subsequent action to recover any legal damage, which he avers, and is able to show, to have been occasioned to him.").

21    Pursuant to New York Civil Service Law § 75(3–a), NYPD can only suspend an officer for thirty days even if he awaits trial on criminal charges.

First, the court again does not find sufficient evidence of damage to reputation to support Zahrey's allegations of "special injury." Zahrey claims that the newspaper articles and press releases show that, as a result of the departmental charges and proceedings, he was "disgraced in the department." In support, Zahrey has presented two newspaper articles, both dated October 17, 1996, *see* Pl.'s Ex. GGG, and one U.S. Department of Justice press release, dated October 16, 1996. *See* Pl.'s Ex. FFF. However, the substance of these exhibits relate solely to LAB's investigation and Zahrey's criminal indictment and arrest. They make no mention of Zahrey's departmental disciplinary proceedings.

Other than these exhibits, as noted in the court's previous opinion, Zahrey provides the court with no other evidence that he is "disgraced." [22] "[V]ague assertions or general statements" of reputational harm do not suffice. *Engel v. CBS Inc.,* 961 F.Supp. 660, 663 (S.D.N.Y.1997); *accord Engel,* 689 N.Y.S.2d 411, 711 N.E.2d at 632.

22    In Zahrey's complaint, he asserts that, on July 1, 1997, Police Commissioner Safir and the Mayor of New York City held a press conference to announce their intention to institute departmental disciplinary proceedings against Zahrey despite his criminal acquittal. Fifth Amended Compl. ¶ 336. However, Zahrey does not cite to the record and the court cannot find any evidence in the record regarding this press conference. Nor has Zahrey asked the court to take judicial notice of any such press conference. *See* Fed.R.Evid. 201.

Second, the court reaffirms its previous finding of no evidence of "special injury" as to Zahrey's three-year modified assignment and alleged subsequent damage to his career. While on modified assignment, NYPD paid Zahrey his full salary. *See Zahrey,* 2009 WL 54495, at *22. Zahrey seems to argue that his modified position, working at the automobile impound lot, deprived him of his former career position and future job opportunities. But the court again notes that, after his departmental acquittal, Zahrey requested to remain at the impound lot, chose not to return to his position as a detective and has not sought out promotions. *Id.*

**\*15** Third, Zahrey's remaining allegations, that he was suspended without pay for twelve days and that, although he received back pay for this suspension, he had to wait almost three years for it, do not constitute "special injury." The court rejects Zahrey's contention that his suspension without pay categorically qualifies as special injury. Courts analyze the special injury requirement on a case-by-case basis, [23] and the particular cases cited by Zahrey, are distinguishable. *See Groat,* 426 N.Y.S.2d at 340–41 (plaintiff was "suspended without pay, dismissed from the force and, at least temporarily, disgraced in the department and in the community"? the town board dismissed plaintiff from the police force, but the Special Term reversed and ordered him restored to the payroll effective from the date of his dismissal); *Fulton,* 151 N.Y.S. at 132 (plaintiff was "suspended from duty without pay, and temporarily disgraced in the department"). Unlike in *Groat* and *Fulton,* the court here does not find sufficient evidence of disgrace in the

department or community attributable to the departmental trial, as mentioned above. In addition, there is no indication that the *Groat* or the *Fulton* plaintiffs were compensated in any way for income denied while suspended without pay. In contrast, Zahrey has been completely compensated for all lost income. [24]

23    *See, e.g., Zhang v. Goff,* No. 25918/2006, 2008 WL 465290 at *3 (N.Y.Sup.Ct. Feb.1, 2008) (legal fees do not amount to' special injury); *Tray Wrap, Inc. v. Pac. Tomato Growers Ltd.,* No 26782/03, 2008 WL 222495, at *21 (N.Y.Sup.Ct. Jan.25, 2008) (same); *Sankin v. Abeshouse,* 545 F.Supp.2d 324, 328 (S.D.N.Y.2008) (same; also vague claims of loss of business, without specifics, and arguments that litigation impaired plaintiff's cancer recovery, do not suffice); *Loftus v. Arthur,* No. 05–1682, 2007 WL 2376883, at *4 (N.Y.Sup.Ct. July 16, 2007) (litigation resulting in delay in building and use of extension of barn did not cause special injuries); *Strumpf v. Asdourian,* No. 110141/06, 2006 N.Y. Misc. LEXIS 3976, at *8–10 (N.Y.Sup.Ct. Dec. 12, 2006) (specific, verifiable loss of business (e.g., hike in malpractice rates, loss of certain clients) constitutes special injury, but allegations of general loss of business do not); *In re Eerie World Entertainment, L.L.C.,* No. 00–13708(ALG), 2006 Bankr.LEXIS 770, at *26–28, 2006 WL 1288578 (Bankr.S.D.N.Y. Apr. 28, 2006) (finding special injury when plaintiff demonstrated a specific, verifiable loss of income, i .e., provided names of clients that refused to do business when they found out about the pending litigation); *Wilhelmina Models, Inc. v. Fleisher,* 19 A.D.3d 267, 797 N.Y.S.2d 83, 85 (N.Y.App.Div.2005) (no special damages because no showing of termination of business relationships or staff reductions; revocable "commitment letter" was also insufficient); *Brown v. Brown,* 343 F.Supp.2d 195, 198 (E.D.N.Y.2004) ("Bare allegations of emotional distress, pain, and suffering" do not state a claim for civil malicious prosecution); *First Merchant Bank OSH, Ltd. v. Village Roadshow Pictures (U.S.A.) Inc.,* No. 01 CIV. 8370(GEL), 2002 WL 1423063, at *6 (S.D.N.Y. June 28, 2002) (plaintiff suffered special injuries when defendant obtained an injunction freezing plaintiff's assets); *Howard v. City of New York,* 294 A.D.2d 184, 741 N.Y.S.2d 687 (N.Y.App.Div.2002) (corrections

officer plaintiff failed to allege special injury when departmental charges filed against her for allegedly appearing in a pornographic video); *Dudick v. Gulvas,* 277 A.D.2d 686, 716 N.Y.S.2d 407, 410 (N.Y.App.Div.2000) (finding special injury when plaintiff chiropractor alleged loss of business as a direct result of defendant's conduct, i.e., complaints about plaintiff's methods sent to his clients and disciplinary board); *Honzawa v. Honzawa,* 268 A.D.2d 327, 701 N.Y.S.2d 411, 413 (N.Y.App.Div.2000) (attachment of bank accounts constitutes special injury); *Engel,* 689 N.Y.S.2d 411, 711 N.E.2d at 632 (attorney plaintiff did not plead sufficient special injury when claiming that, when sued by his client's adversary, a conflict of interest was created and increased his work load); *Chi Chao Yuan v. Rivera,* 48 F.Supp.2d 335, 349 (S.D.N.Y.1999) (depriving mother of her children for several months reaches the "threshold" of special injury); *Tsafatinos v. Ward,* 177 Misc.2d 590, 676 N.Y.S.2d 748, 751 (N.Y.Civ.Ct.1998) (illegal lockout action amounted to special injury as plaintiff "suffered interference with her property as a result of that claim"); *Engel,* 961 F.Supp. at 662–65; *Kidder, Peabody & Co. v. IAG Int'l Acceptance, Group N.V.,* No. 94 Civ. 4725(CSH), 1997 U.S. Dist. LEXIS 12976, at *8–17, 1997 WL 539772 (S.D.N.Y. Aug. 27, 1997) (general allegations of reputational harm resulting from a lawsuit, including general assertions of damage to character, reputation, good name, business, and credit, do not amount to special injury; however, plaintiff may show special injury if defendant's filing of lis pendens undermined a contractual relationship and plaintiff lost a client); *Venezia v. Sirulnick,* 213 A.D.2d 629, 624 N.Y.S.2d 62, 63 (N.Y.App.Div.1995) ("the mere service of process without further interference from some provisional remedy does not rise to the level of malicious prosecution"); *Furgang v. JMK Bldg., Corp.,* 183 A.D.2d 1062, 583 N.Y.S.2d 610, 612 (N.Y.App.Div.1992) (defendant's breach of contract action, which only resulted in damages "normally attendant upon being sued," did not allow for plaintiff's malicious prosecution action); *Campion Funeral Home, Inc. v. State,* 166 A.D.2d 32, 569 N.Y.S.2d 518, 521 (N.Y.App.Div.1991) (holding that legal expenses and injury to reputation are not enough to show

special injury); *Salamanca Trust Co. v. McHugh,* 156 A.D.2d 1007, 550 N.Y.S.2d 764, 765–66 (N.Y.App.Div.1989) (no order of attachment issued and no property was attached; because not "actual interference" with plaintiff's property, no special injury); *Molinoff v. Sassower,* 99 A.D.2d 528, 471 N.Y.S.2d 312, 313–14 (N.Y.App.Div.1984) (holding that having to spend a substantial amount of time corresponding with two insurance carriers and with retained counsel to determine coverage does not constitute special injury); *Tedeschi v. Smith Barney, Harris Upham & Co.,* 548 F.Supp. 1172, 1174 (S.D.N.Y.1982) (finding no special injury when private individual, not pursuant to court order or authority, withheld plaintiff's paycheck); *Hoppenstein v. Zemek,* 62 A.D.2d 979, 403 N.Y.S.2d 542, 543–44 (N.Y.App.Div.1978) (plaintiff did not suffer special injury after being sued for medical malpractice); *Drago v. Buonagurio,* 61 A.D.2d 282, 402 N.Y.S.2d 250, 251 (N.Y.App.Div.1978) (same); *Lincoln First Bank v. Siegel,* 60 A.D.2d 270, 400 N.Y.S.2d 627, 634 (N.Y.App.Div.1977) (no special injury when evidence demonstrates that the attachment had no effect upon plaintiff's construction project and no property could have been levied on given an IRS levy); *Stokes v. Rase,* 51 A.D.2d 983, 380 N.Y.S.2d 310, 311–12 (N.Y.App.Div.1976) (involuntary bankruptcy petition resulted in special injury); *Muller v. Star Supermarkets, Inc.,* 49 A.D.2d 696, 370 N.Y.S.2d 768, 770 (N.Y.App.Div.1975) (finding no special injury, when plaintiff alleged that defendant's lawsuit served as a blemish to good title and plaintiff thus sold premises on less favorable terms); *Williams v. Williams,* 23 N.Y.2d 592, 298 N.Y.S.2d 473, 246 N.E.2d 333, 335 (N.Y.1969) (no action for abuse of process lied when defendant filed an action for conspiracy to misappropriate and misuse trade secrets and assets against plaintiff and had copies of summons and complaint printed and circulated to members of the trade); *Watson v. City of New York,* 57 Misc.2d 542, 293 N.Y.S.2d 348, 353–55 (N.Y.Civ.Ct.1968) (instituting paternity proceedings can amount to special injury); *Chappelle v. Gross,* 26 A.D.2d 340, 274 N.Y.S.2d 555, 557–59 (N.Y.App.Div.1966) (filing of lis pendens alone leads to special injury); *J.J. Theatres, Inc. v. V.R.O.K. Co.,* 96 N.Y.S.2d 271, 273 (N.Y. Spec. Term 1950) (simple allegations

that plaintiff is "annoyed, harrassed, disturbed" do not amount to special injury, however a showing of an appreciable effect on business—that business decreased and the value of leasehold lessened because of public knowledge of the law suit—will suffice); *Schultnan v. Modern Indus. Bank,* 178 Misc. 847, 36 N.Y.S.2d 591, 593 (N.Y. Spec. Term 1942) (refusing to find special injury where plaintiff merely alleged mailing of a notice of levy and issuance of execution to a city marshal); *Sachs v. Weinstein,* 208 A.D. 360, 203 N.Y.S. 449, 456 (N.Y.App.Div.1924) (involuntary bankruptcy petition resulted in special injury); *Reade v. Halpin,* 113 Misc. 385, 184 N.Y.S. 433, 439–40 (N.Y.App.Div.1920) (holding that the institution of mental insanity proceedings can lead to special injury); *Paul v. Fargo,* 84 A.D. 9, 82 N.Y.S. 369, 370 (N.Y.App.Div.1903) (plaintiff sued for conversion did not suffer any damages apart from defending the lawsuit, and thus could not maintain his malicious prosecution action).

24     See *Mosley v. Del. River Port Auth.,* No. 99–4147(JBS), 2000 U.S. Dist. LEXIS 22402, at *2–3, *36, 2000 WL 1534743 (D.N.J. Aug. 7, 2000) (plaintiff did not allege sufficient special injury when, following disciplinary hearings, was fired, but was returned to his job with backpay and seniority); *Hollars v. S.-Pac. Transp. Co.,* 110 N.M. 103, 792 P.2d 1146, 1148, 1151 (N.M.1989) (following disciplinary hearings, plaintiff was dismissed, but was reinstated and paid a portion of his backpay—the court held he did not demonstrate special injury). *Compare Niebur v. Town of Cicero,* 212 F.Supp.2d 790, 799, 812, 816 (N.D.Ill.2002) (plaintiff suffered special damages, because although he was reinstated with full backpay and benefits, he was then later fired and never reinstated—lost wages plus loss of career or vocation suffices); *Hairston v. District of Columbia,* 638 F.Supp. 198, 201–02, 204–05 (D.D.C.1986) (plaintiff did not suffer special injury when denied his backpay after reinstatement pursuant to police department policy).

Zahrey's main contention is that the delay of his back pay for three years sufficiently analogizes to a "provisional" or "incidental" remedy. But Zahrey has not pointed the court to any case law directly on this point. Again, provisional or incidental remedies, or similarly compensable "special

injuries," require a "highly substantial and identifiable interference with person, property, or business." *Engel*, 689 N.Y.S.2d 411, 711 N.E.2d at 631. Even assuming that New York Civil Service Law § 75(3) would create property rights, particularly for police officers covered by section 75(3–a), section 75(3) allows for back pay only upon acquittal pursuant to departmental proceedings.[25] Thus any "property" Zahrey would have in his back pay would not accrue until his disciplinary acquittal. *See Hairston*, 638 F, Supp. at 204–05 (finding no constitutionally protected property right in back pay absent a statutory entitlement); *NLRB v. Sunshine Mining Co.*, 125 F.2d 757, 761 (9th Cir.1942) ("The award of back pay is not a private judgment or a chose in action belonging to the employee, and he has no property right in the award pending his actual receipt of it."); *cf. Winston v. City of New York*, 759 F.2d 242, 247–48 (2d Cir.1985) (in the context of pension benefits, "while the Code grant[s] members of the City certain 'contractual' or 'quasi-contractual' rights, only when the statutory conditions for retirement [are] met d[o] those rights vest" (citing *Eberle v. LaGuardia*, 285 N.Y. 247, 33 N.E.2d 692, 693 (N.Y.1941))), Instead, Zahrey's delay in receiving his back pay was, as a necessary part of the process mandated in section 75(3), merely incident to his departmental proceedings. *See Loftus*, 2007 WL 2376883, at *4 (litigation resulting in delay in building and use of extension of barn did not cause special injuries); *Aalfs v. Aalfs*, 246 Iowa 158, 66 N.W.2d 121, 122–27 (Iowa 1954) (failure to obtain credit from bank, slowdown in manufacturing, and loss of profit not special injuries); *see also Tarver v. Wills*, 174 Ga.App. 550, 330 S.E.2d 896, 898–99 (Ga.Ct.App.1985) (increase in insurance premiums, like attorneys fees, are an "unavoidable incident" of a physician's defense of a medical malpractice case or other litigation); *Moiel v. Sandlin*, 571 S.W.2d 567, 571 (Tex.Civ.App.1978) (same). The court thus finds that Zahrey's evidence does not amount to evidence of special damages.

[25]   "Pending the hearing and determination of charges of incompetency or misconduct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days.... If he is acquitted, he shall be restored to his position with full pay for the period of suspension less the amount of any unemployment insurance benefits he may have received during such period." N.Y. Civ. Serv. Law § 75(3). *But see* N.Y. Admin. Code § 14–115(c), *available at* http://public.leginfo.state.ny.us/menugetf.cgi? COMMONQUERY=LAWS ("The commissioner is also authorized and empowered in his or her discretion, to deduct and withhold salary from any member or members of the force, for or on account of absence for any cause without leave, lost time, sickness or other disability, physical or mental; provided, however, that the salary so deducted and withheld shall not, except in case of absence without leave, exceed one-half thereof for the period of such absence; and provided, further, that not more than one-half pay for three days shall be deducted on account of absence caused by sickness.").

### *VII. Conclusion*

**\*16**  In accordance with this opinion:

• The court amends its January 7th order to recharacterize Zahrey's right to a fair trial claim as an action for violation of his right to procedural due process rooted in the Fifth, Sixth and Fourteenth Amendments.

• OTHERWISE, Zahrey's motion is DENIED in its entirety.

It is so ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1024261

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 2120518
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lafrancis GRAY–DAVIS;
and Myrell Davis, Plaintiffs,
v.
State of NEW YORK; Paul Rigby, Senior Parole
Officer; Tammy Gronau, Parole Officer; Mr. Green,
Parole Officer; Mr. Maher, Parole Officer; Ms.
Delaney, Parole Officer; Mr. Fregoe, Parole Officer;
Ms. Montford, Supervisor Parole Officer; Robert
Butera, Parole Officer; Anthony I Annucci, Acting
Comm'r of Dep't of Corr. and Cmty. Supervision;
Tinam. Stanford, Chair of Bd. of Parole; Randy W.
Blume, Assist. Comm'r of Onondaga Cnty. Dep't
of Corr.; Timothy H. Cowin, Comm'r of Onondaga
Cnty. Dep't of Corr.; Cnty. of Onondaga; Onondaga
Cnty. Dep't of Corr.; City of Jamesville; City of
Syracuse; Syracuse City Police Dep't; John Doe
Nos. 1–4, Parole Officers; John Doe Nos. 5–
15, Syracuse City Police Officers; and John Doe
16, Chief of Syracuse City Police, Defendants.

No. 5:14–CV–1490 (GTS/TWD).
|
Signed May 5, 2015.

**Attorneys and Law Firms**

Lafrancis Gray–Davis, Syracuse, NY, pro se.

DeRoberts Law Firm, Jeffrey DeRoberts, Esq., of Counsel,
Syracuse, NY, for Plaintiff Myrell Davis.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this civil rights action
filed by LaFrancis Gray–Davis and her minor son Myrell
Davis ("Plaintiffs"), against the above-captioned entities
and individuals ("Defendants") arising from two searches
by police and the institution of special conditions by
parole officers between December 2013 and April 2014,
is the Report–Recommendation of United States Magistrate

Thérèse Wiley Dancks recommending that certain of
Plaintiffs' claims be dismissed with prejudice, certain of the
claims be dismissed without prejudice (and with leave to
amend as authorized by the Court), and certain of the claims
survive the Court's initial review of Plaintiffs' Complaint.
(Dkt. No. 6.) Plaintiffs have not filed an objection to the
Report–Recommendation and the deadline in which to do so
has expired. (*See generally* Docket Sheet.)

When *no* objection is made to a report-recommendation, the
Court subjects that report-recommendation to only a *clear
error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes:
1983 Addition. When performing such a "clear error" review,
"the court need only satisfy itself that there is no clear error on
the face of the record in order to accept the recommendation."
*Id.: see also Batista v. Walker,* 94–CV–2826, 1995 WL
453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I
am permitted to adopt those sections of [a magistrate judge's]
report to which no specific objection is made, so long as
those sections are not facially erroneous.") (internal quotation
marks and citations omitted).

Here, based upon a review of this matter, the Court can find
no clear error in Magistrate Judge Dancks' thorough Report–
Recommendation. (Dkt. No. 6.) Magistrate Judge Dancks
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. (*Id.*) As a result,
the Report–Recommendation is accepted and adopted in its
entirety for the reasons stated therein.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 6) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that the following claims are *DISMISSED* with
**prejudice** and **without leave to amend:**

(1) all claims against Defendant State of New York;

(2) all claims against Defendant Onondaga County
Department of Corrections;

(3) all claims against Defendant Syracuse City Police
Department;

(4) Plaintiffs' 42 U.S.C. § 1983 claims for money damages
against Defendants Annucci, Stanford, Rigby, Gronau,

Green, Maher, Delaney, Fregoe, Montford, Butera, and John Doe Nos. 1–4;

(5) Plaintiffs' claim for violation of their Fifth and Ninth Amendment rights; and it is further

**ORDERED** that the following claims **shall be *DISMISSED* with prejudice** and without further Order of this Court **UNLESS,** within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiffs file an Amended Complaint correcting the pleading deficiencies referenced in Magistrate Judge Dancks' Report–Recommendation:

  **\*2**  (1) Plaintiffs' claims against Defendant County of Onondaga;

  (2) Plaintiffs' claims against Defendant Hamlet of Jamesville (a/k/a City of Jamesville);

  (3) Plaintiffs' claims against Defendant City of Syracuse;

  (4) Plaintiffs' claims against Defendants Butera, Blume, Cowin and John Doe No. 16; and

  (5) Plaintiffs' claims against Defendants Annucci and Stanford (**EXCEPT** for their 42 U.S.C. § 1983 claims for money damages against those two Defendants in their official capacities, which claims again are dismissed with prejudice and without leave to amend); and it is further

**ORDERED** that any Amended Complaint that Plaintiffs chose to file shall be a complete pleading, which will supersede their original Complaint in all respects, and may not incorporate any portion of the original Complaint by reference, in accordance with Local Rule 7.1(a)(4) of the District's Local Rules of Practice; and it is further

**ORDERED** that Plaintiffs' remaining claims—i.e., their claims against Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford ("Remaining Defendants") for violation of Plaintiffs' First, Fourth and Fourteenth Amendment rights—**SURVIVE** the Court's initial review of the Complaint; and it is further

**ORDERED** that the District Court shall issue summonses, along with copies of the Complaint and General Order 25, to the United States Marshal for service upon the remaining Defendants; and it is further

**ORDERED** that counsel for the Remaining Defendants shall file a formal response to the surviving claims in the Complaint in accordance with Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiffs shall take reasonable steps to identify Defendant John Doe Nos. 1–15 and, if necessary, make a motion seeking leave to amend her pleadings to add the proper party; and it is hereby

**ORDERED** that the Clerk of Court serve a copy of this Decision and Order upon Plaintiff LaFrancis Gray–Davis by regular mail.

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

The Complaint of *pro se* Plaintiff LaFrancis Gray–Davis, on her own and on behalf of her son, Myrell Davis, was received for filing in the Northern District of New York on December 11, 2014, along with an application to proceed *in forma pauperis.* (Dkt. Nos. 1 and 2.) By Order of December 18, 2014, the Court granted Plaintiff's application to proceed *in forma pauperis.* (Dkt. No. 4 at 2–3.) Because Plaintiff, who is not an attorney and not represented by counsel, may not appear on behalf of her minor child, Myrell, *see Cheung v. Youth Orchestra Found., of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990), the Court deferred the requisite initial review of the Complaint pursuant to 28 U.S.C. § 1915(e) and stayed the case for ninety days in order to give Plaintiff time to retain counsel, at least for her minor son. *Id.* at 3. Attorney Jeffrey DeRoberts, Esq. filed a Notice of Appearance on behalf of Myrell Davis on January 8, 2015, thereby removing the impediment to initial review of the Complaint. (Dkt. No. 5.)

### I. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

 **\*3**  Even when a plaintiff meets the financial criteria for *in forma pauperis,* 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "An action is frivolous where either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy, or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se,* the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

## II. PLAINTIFF'S COMPLAINT

**\*4** Plaintiff met James D. Davis ("Davis") in July of 2009, when he was on parole supervision, and the couple had a child, Myrell Davis, in 2010. (Dkt. No. 1 ¶¶ at 5 and 6.) Davis was violated by parole supervision on September 22, 2011, and Defendant Senior Parole Officer Paul Rigby ("Rigby"), who allegedly had a vendetta against Plaintiff because of her association with Davis, acted to prevent Plaintiff and Davis from being married at the Onondaga County Justice Center in November of 2011. *Id.* at ¶¶ 7–8.

Plaintiff and Davis were married on November 12, 2012, while Davis was incarcerated, and on July 30, 2013, when Davis was about to be released, Plaintiff was informed by his parole officer, Defendant Ms. Montford ("Montford"), that she and her son and all family members were not permitted to have contact with Davis. *Id.* at ¶¶ 9–10. Included in the special conditions in the Certificate of Release to Parole Supervision signed by Davis on August 6, 2013, was the condition "17. I will not associate in any way or communicate by any means with ... Latesha Dexter and Lafrancis Gray without the permission of the P.O." *Id.* at p. 56. Included in a list of Special Conditions of Release to Parole Supervision in connection with Plaintiff's July 30, 2013, release, signed by Davis on February 24, 2014, were:

> 13(i): I will have no in person contact, or attempt to contact **Eric Roam, Latesha Dexter and/or LaFrancis Gray–Davis.** Either in person or members of their immediate family by means of letter, telephone, cell phone, third party, electronic means or any other methods without the knowledge and written permission of my parole officer. Failure to follow this rule is a violation of my parole in an important respect.

> 13(q): I will have contact with any children in common with **LaFrancis Gray–Davis** if court ordered only.

*Id.* at pp. 58, 60. Depending on Davis' parole officer, Plaintiff and Davis have at times been able to have contact with one

another and even share a home. Other times they have not. *Id.* at ¶ 12.

On Christmas Eve or Christmas day of 2013, Defendant parole officers John Doe Nos. 1 through 4 searched Plaintiff's home looking for Davis, whom they had reason to believe was there. *Id.* at ¶ 13. Davis was not in the house, and according to Plaintiff, because he was not paroled to her address and was not supposed to be there, the four Doe Defendants had no probable cause to invade her home and privacy and search her house. *Id.*

On March 11, 2014, at approximately 7:45 p.m., while Plaintiff, with Myrell in the car, was giving Davis a ride home, she was pulled over by Defendant Parole Officers Tammy Gronau ("Gronau"), Mr. Green ("Green"), Mr. Maher ("Maher"), Ms. Delaney ("Delaney"), and Mr. Fregoe ("Fregoe"), along with Defendant Syracuse Police Officers John Doe Nos. 5 though 15. *Id.* at ¶ 14. Defendants Gronau and Green searched Plaintiff's car and found several empty beer cans and a folding knife that Plaintiff claims belonged to her. Defendants also stated that Myrell was not in a child safety seat, which Plaintiff contends is untrue. *Id.* Davis was taken into custody. *Id.* According to Plaintiff, the only reason the vehicle was stopped was that she and her son were with Davis. *Id.*

**\*5** On April 1, 2014, Plaintiff received a letter from Defendant Randy W. Blume (Blume"), Assistant Commissioner of the Onondaga County Correctional Facility, stating that due to the special conditions prohibiting Davis from having contact with her and her son, he was restricting Plaintiff from visiting or communicating with Davis by telephone while he was at the facility unless or until the conditions of parole were removed. *Id.* at ¶ 17.

### III. ANALYSIS

Plaintiff's Complaint contains ten causes of action for violation of Plaintiff and her son's right to privacy and freedom of association under the First Amendment; illegal search and seizure in violation of the Fourth Amendment; violation of Plaintiff and her son's right to life, liberty, family, and privacy protected under the Fifth Amendment; violation of Plaintiff and her son's right to privacy and other rights protected under the Ninth Amendment; violation of Plaintiff and her son's right to life, liberty, family, and privacy protected under the Fourteenth Amendment; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence;

supervisory liability, including failure to train, supervise, and control employees, employers, agents and successors; and violation of 42 U.S.C. § 1983.[1] (Dkt. No. 1 at ¶¶ 19–101.) The allegations of wrongdoing by Defendants set forth in each of the causes of action appear to be virtually identical. *Id.*

[1]   42 U.S.C. § 1983 does not create any independent substantive rights, but rather serves as a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

### A. State of New York

Plaintiff has named the State of New York as a Defendant. The only allegations directed to the State in the Complaint are conclusory assertions of supervisory liability. (*See, e.g.,* Dkt. No. 1 at ¶ 23.) Plaintiff's claims against the State are barred by sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The bar precludes claims against the State for both monetary and equitable relief. *See Edelman v. Jordan,* 415 U.S. 651, 667–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Therefore, the Court recommends that the action be dismissed with prejudice as against the State of New York on sovereign immunity grounds.

### B. Municipal Defendants

Plaintiff has named as Defendants the County of Onondaga, City of Jamesville,[2] and the City of Syracuse. The Onondaga County Department of Corrections and Syracuse City Police Department have also been named as Defendants. However, as explained in *Baptista v. Onondaga County Dep. of Corrections,* No. 9:04–CV–0600 (LEK/GHL), 2007 WL 911854, at * 5, 2007 U.S. Dist. LEXIS 20536, at * 13 (N.D.N.Y. Mar.22, 2007), the County of Onondaga Department of Corrections and the County of Onondaga "are one in the same the County of Onondaga, a municipal corporation of the State of New York ." Furthermore, "[a] police department is an administrative arm of [a] municipal corporation," and "cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999) (citing *Loria v. Town of Irondequoit,* 775 F.Supp. 599, 606 (W.D.N.Y.1990); *see also Dexter v. City of Syracuse,* No. 5:14–CV–0363 (TJM/DEP), 2014 WL 2611384, at *4, 2014 U.S. Dist. LEXIS 80008, at *11 (N.D.N.Y. June 11, 2014). Therefore, any claims Plaintiff might have against the County of Onondaga Department

Case 5:20-cv-01489-DNH-TWD    Document 10    Filed 04/21/21    Page 74 of 87
Gray-Davis v. New York, Not Reported in F.Supp.3d (2015)
2015 WL 2120518

of Corrections and City of Syracuse Police Department are properly asserted against the County of Onondaga and City of Syracuse, respectively.

2      The Court takes judicial notice that Jamesville, New York is a hamlet located within the Town of DeWitt, not a city. (*See* http://www.townofdewitt.com/LivingDeWitt.aspx last visited on March 24, 2015.)

**\*6** Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611), *cert denied,* ––– U.S. ––––, 134 S.Ct. 125 (2013); *see also Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection or an 'affirmative link' between the policy and the deprivation of his constitutional rights.") (citing *Oklahoma v. Tuttle,* 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)) (plurality opinion).

Plaintiff has failed to identify or allege any facts showing the existence of a municipal policy or custom of Onondaga County, the hamlet of Jamesville, or the City of Syracuse which resulted in the deprivation of her and her son's constitutional rights. A municipality may be liable for deprivation of constitutional rights under § 1983 with regard to policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). However, Plaintiff's conclusory allegations that Onondaga County, Jamesville, and the City of Syracuse failed to properly hire, supervise, and train subordinates, without supporting factual allegations of, among other things, a policy or custom pursuant to which the alleged action was undertaken, fails to state a claim against those municipalities that is plausible on its face. *See Trombley,* 550 U.S. at 570; *Hall v. Smith,* 170 F. App'x 105, 108 (11th

Cir.2006) (affirming dismissal of § 1983 claim against a municipality where plaintiff alleged no factual support for his conclusory statement that the municipality had a policy or custom of grossly inadequate supervision and training of its employees.)

Given the foregoing, the Court recommends that Plaintiff's § 1983 claims be dismissed as against Defendants County of Onondaga, Jamesville, and the City of Syracuse without prejudice; and be dismissed with prejudice as against the Onondaga County Department of Corrections and the Syracuse City Police Department, given that any claims Plaintiff may be able to plead with regard to the two departments would be properly asserted against the County of Onondaga and City of Syracuse.

## C. Plaintiffs' Official Capacity Claims For Money Damages Against the State Official Defendants

**\*7** Plaintiffs have asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at p. 9.) The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). The Eleventh Amendment bars all money damages claims against state officials acting in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Eleventh Amendment has been found to bar official capacity claims for money damages against New York Department of Correctional and Community Supervision ("DOCCS") officials and parole officers. *See Tolliver v. New York State Corrections Officer,* No. 99CIV.9555(JGK), 2000 WL 1154311, at \* 2, 2000 U.S. Dist. LEXIS 11531, at \* 7 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."); *James v. Suffolk County Correctional Facility,* No. 13–CV–2344 (JFB)(SIL), 2014 WL 4659300, at \*4, 2014 U.S. Dist. LEXIS 131056, at \* 10–11 (E.D.N.Y. Sept. 17, 2014) (official capacity claims for money damages against parole officers are barred by the Eleventh Amendment).

Therefore, the Court recommends that Plaintiff's § 1983 claims for money damages against Defendants Anthony J. Annucci ("Annucci"), Acting Director of DOCCS, Tina M. Stanford ("Stanford"), Chair of the Board of Parole, and all of the Defendant Parole Officers, including Defendants John

Doe 1 through 4, in their official capacities be dismissed with prejudice on Eleventh Amendment grounds.

**D. Supervisory Liability**

Defendants Annucci, Stanford, Tim Cowan ("Cowan"), Commissioner of the Onondaga County Department of Correction, and John Doe No. 16, Chief of the Syracuse City Police, have all been sued in their supervisory capacities by Plaintiff. [3] (*See, e.g.,* Dkt. No. 1 at ¶ 23.)[4] In the case of Defendants Annucci and Stanford, the subordinates include the Defendant Parole Officers, including Defendants John Doe 1 through 4. (Dkt. No. 1 at ¶ 23.) Blume is identified as Cowan's subordinate. *Id.* In the case of Defendant John Doe No. 16, the subordinates include Syracuse Police Officers Defendants John Doe Nos. 5 through 15. *Id.*

[3] Plaintiff has recommended dismissal of Plaintiff's supervisory claims against the municipal Defendants under *Monell.*

[4] Plaintiff has repeated the identical conclusory allegations of supervisory liability against the Defendants in each of her ten causes of action. (*See* Dkt. No. 1 at ¶¶ 23, 30, 38, 46, 54, 62, 69, 76, 83, 90.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*") "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim" (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

*8 The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 maybe found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff has alleged that Defendants Annucci, Stanford, Cowan, and John Doe 16 failed to properly hire, oversee, supervise, train, and control their subordinates. (Dkt. No. 1 at ¶ 23.) Vague and conclusory claims that a supervisory official has failed to provide proper training and supervision or created a specific policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (same).

Plaintiff has also parroted each of the *Colon* factors as grounds for supervisory liability. *Id.* "Conclusory statements and formulaic recitations of the Colon factors [that are] wholly unsupported by facts," present no factual support for a supervisory liability claim. *Eldridge v. Kenney,* No. 11–CV–6459–FPG, 2014 WL 2717982, at * 3, 2014 U.S. Dist. LEXIS 84437, at * 2–3 (W.D.N.Y. June 16, 2014).

In light of Plaintiff's failure to allege facts of a nonconlusory nature showing personal involvement by Annucci, Stanford, Cowan, and John Doe No. 16 in the alleged violations of Plaintiff and her son's constitutional rights, the Court recommends that Plaintiff's § 1983 claims be dismissed without prejudice as against those Defendants.

**E. Defendant Butera**

Defendant Robert Butera (Butera") is identified as a Parole Officer in Plaintiff's Complaint. (Dkt. No. 1 at p. 4.) With the exception of Plaintiff's inclusion of Butera's name in the conclusory claims of wrongdoing in each of her causes of action, *id.* at ¶ 23, the Complaint is devoid of factual allegations regarding Butera. As noted above, personal involvement in a constitutional deprivation is a prerequisite to an award of damages under § 1983." *McKinnon,* 568 F.2d at 934; *see also Crichlow v. Fischer,* No. 12–cv–7774 (NSR), 2015 WL 678725, * 9, 2015 U.S. Dist. LEXIS 18812, at * 17 (S.D.N.Y. Feb. 17, 2015) (dismissing defendants from the case upon initial review under 28 U.S.C. § 1915(e) where the plaintiff made no factual allegations regarding personal involvement on their part in the violation of plaintiff's rights). The complete absence of factual allegations of wrongdoing by Bufera warrants dismissal of Plaintiff's state law claims as well. Therefore, the Court recommends that the case be dismissed without prejudice as against Defendant Butera.

### F. Defendant Blume

**\*9** The sole factual allegation in the Complaint against Defendant Blume, the Assistant Director of the Onondaga County Department of Corrections is that he informed Plaintiff that he was restricting Plaintiff from visiting or communicating with Davis by telephone while he was at the facility due to the special conditions prohibiting Davis from having contact with her and her son unless and until the condition of parole was removed. *Id.* at ¶ 17. Inasmuch as there are no factual allegations indicating that Blume was doing anything more than complying with special conditions of release to parol supervision that had been imposed by DOCCS, the Court recommends that the case be dismissed without prejudice as against him.

### G. Plaintiff's Ninth Amendment Claim

Plaintiff claims that the Defendants violated her and her son's right to privacy and other rights guaranteed under the Ninth Amendment. (Dkt. No. 1 at ¶ ¶ 42–49.) The Ninth Amendment provides that "[t]he enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Amendment is a "rule of construction" and does not give rise to "individual rights." *Jenkins v. C.I.R.,* 483 F.3d 90, 92–93 (2d Cir.2007) (Ninth Amendment is not an independent source of individual rights but a rule of construction). Therefore, to the extent Plaintiff is asserting a § 1983 claim for an independent violation of the

Ninth Amendment, the Court recommends that the claim be dismissed with prejudice as against all of the Defendants.

### H. Plaintiff's State Law Claims for Negligence and Intentional and Negligent Infliction of Emotional Distress

Plaintiff has included state law causes of action for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against the Defendants for denying her and her son the benefits that arise from familial association, for subjecting them to the unreasonable search of her home and car, and, in the case of the municipal defendants and Annucci, Stanford, Cowin, and John Doe No. 16, for failing to properly supervise their subordinates.

#### 1. *Intentional Infliction of Emotional Distress*

Under New York law, to state a claim for intentional infliction of emotional distress, a plaintiff must plead "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury, and (4) severe emotional distress." *Bender v. City of N.Y.,* 78 F.3d 787, 790 (2d Cir.1996). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001). The Court finds that the allegations in Plaintiff's Complaint do not show conduct making a plausible showing of intentional infliction of emotional distress by any of the Defendants and recommends that the claim be dismissed without prejudice as to all Defendants.

#### 2. *Negligence and Negligent Infliction of Emotional Distress*

**\*10** Although Plaintiff has alleged that the Parole Officer and Syracuse Police Department Defendants intentionally and/or negligently denied her and her son's right to association and subjected them to unreasonable searches and seizures, the factual allegations in the Complaint reveal that Plaintiff's claims are premised on intentional not negligent conduct. A claim for negligent infliction of emotional distress maybe established under either (1) the "bystander theory" or (2) the "direct duty theory." *Baker v. Dorfman,* 239 F.3d 415, 421 (2d Cir.2000). Both theories require an act of negligence and physical injury or the threat of danger, either to the plaintiff or to a close family member. *Id.* To recover under the "bystander theory," the plaintiff must be "threatened with physical harm

as a result of the defendant's negligence" and "consequently suffer[ ] emotional injury from witnessing the death or serious bodily injury of a member of [his or her] immediate family." *Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1966). To recover under the "direct duty" theory, a plaintiff must suffer an emotional injury from defendant's breach of a duty which unreasonably endangered [his or her] own physical safety." *Id.*

The Court finds that Plaintiff's Complaint fails to allege facts stating a plausible claim for either negligence or negligent infliction of emotional distress against Defendants and recommends that the claim be dismissed without prejudice as against all of the Defendants.

### I. Plaintiff's Surviving Claims

Plaintiff's Complaint asserts claims for violation of her and her son's First Amendment right of liberty in their family life and Fourteenth Amendment due process right to intimate association [5] as a result of the imposition and enforcement of the special conditions of release to parole supervision that prevent Plaintiff and her son from being with Davis, as well as her Fourth Amendment right to be free from unreasonable searches and seizures in connection with the search of her home in December of 2013 and the traffic stop and search of her car on March 11, 2014. (Dkt. No. 1 at pp. 13, 18, and 41.)

[5]    Plaintiff has also asserted a due process claim under the Fifth Amendment. (Dkt. No. 1 at p. 21.) However, the due process clause of the Fifth Amendment applies only to actions taken by the federal government, not state or local governments. *See Schweiker v. Wilson,* 450 U.S. 221, 227, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *see also Canfield v. Douglas County,* No. 14–cv–00461–KMT, 2014 WL 7186749, at * 5, 2014 U.S. Dist. LEXIS 173224, at * 12–13 (D.Col. Dec.16, 2014) (Fifth Amendment deprivations such as those challenging due process rights to familial association with no allegation of federal involvement are not actionable under the Fifth Amendment).

Mindful of the Second Circuit's instruction to liberally construe a *pro se* plaintiff's pleadings, *see Sealed Plaintiff,* 537 F.3d at 191, the Court recommends that Plaintiff be permitted to pursue her and her son's First, Fourth, and Fourteenth Amendment claims (first, second and fifth causes

of action) against Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, Montford, and John Doe Nos. 1–15.

The Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that the case be dismissed with prejudice as against: (1) Defendant State of New York on sovereign immunity grounds; (2) Defendant Onondaga County Department of Corrections on the grounds it is one and the same with Defendant County of Onondaga; and (3) Defendant Syracuse City Police Department on the grounds that it is not an entity capable of being sued; and it is further

 *11  **RECOMMENDED** that the following claims be dismissed with prejudice: (1) Plaintiff's § 1983 claims for money damages against Defendants Annucci, Stanford, Rigby, Gronau, Green, Maher, Delaney, Fregoe, Montford, Butera, and John Doe Nos. 1–4 on Eleventh Amendment grounds; and (2) Plaintiff's claim for violation of her and her son's Fifth and Ninth Amendment rights for failure to state a claim; and it is further

**RECOMMENDED** that the case be dismissed for failure to state a claim, with leave to file an amended complaint as authorized by the District Court as against Defendants: (1) County of Onondaga; (2) Jamesville; (3) City of Syracuse; (4) Bufera; (5) Blume; (6) Cowin; (7) John Doe No. 16; and (8) Annucci and Stanford (except without leave to amend § 1983 official capacity claims for money damages); and it is further

**RECOMMENDED** that the District Court direct service on Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford of the surviving claims for violation of Plaintiff and her son's First, Fourth, and Fourteenth Amendment rights; and it is further

**RECOMMENDED** that Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford be required to file a formal response to the surviving claims as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**RECOMMENDED** that Plaintiff be directed to take reasonable steps to identify Defendants John Doe Nos. 1–15,

2015 WL 2120518

and, if necessary, make an appropriate motion seeking leave to amend her pleadings to add the proper party; and it is hereby

**ORDERED** that any paper sent by a party to the Court or the Clerk shall be accompanied by a certificate setting forth the date a true and correct copy of it was mailed to all opposing parties or their counsel. ***Any letter or other document received by the Clerk or the Court which does not include a certificate of service which clearly states that an identical copy was served upon all opposing parties or their attorneys is to be returned, without processing, by the Clerk.*** Plaintiff shall also comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All motions shall comply with the Local Rules of Practice of the Northern District; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report–Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with

*Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

**\*12**  Dated: March 27, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2120518

---

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:20-cv-01489-DNH-TWD   Document 10   Filed 04/21/21   Page 79 of 87

Hawthorne v. City of Albany, Not Reported in Fed. Supp. (2017)

2017 WL 6520774

2017 WL 6520774
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darryl L. HAWTHORNE, Plaintiff,

v.

CITY OF ALBANY, et al., Defendants.

1:17-CV-00716 (GTS/TWD)
|
Signed 11/14/2017

**Attorneys and Law Firms**

DARRYL L. HAWTHORNE, 40 Anne Street, New York, New York 10038, Plaintiff, pro se.

**ORDER AND REPORT-RECOMMENDATION**

Therese Wiley Dancks, United States Magistrate Judge

**I. INTRODUCTION**

 **\*1**  Plaintiff's amended complaint in this *pro se* civil rights action brought under 42 U.S.C. § 1983 is before the Court for initial review. [1] (Dkt. No. 8.) Plaintiff, Darryl L. Hawthorne, originally commenced this action against the City of Albany; Albany Police Officers Devin Anderson, Sean Perkins, and Alex Cheban; and Albany Detectives John Norris and Tyson Ruecker. [2] (Dkt. No. 1.) Plaintiff has added Albany Police Sergeant Christ as a Defendant in his amended complaint. (Dkt. No. 8.)

[1]      Plaintiff submitted his amended complaint to the Clerk on October 6, 2017. (Dkt. No. 8.) On November 6, 2017, Plaintiff submitted 179 pages of supplemental exhibits to the amended complaint. (Dkt. Nos. 12, 12-1, 12-2, 12-3, 12-4, 12-5, and 12-6.) The Court has treated the supplemental exhibits as a part of Plaintiff's amended complaint in its initial review.

[2]      Plaintiff has identified Norris and Ruecker as police officers in both his original and amended complaints. (Dkt. Nos. 1 at 1; 8 at 1.) However, both Norris and Ruecker have been identified as detectives with the Albany Police Department in

Plaintiff's submissions. (Dkt. Nos. 8-2 at 1; 8-3 at 2.)

The claims that survived initial review of Plaintiff's original complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(iii) are: (1) Plaintiff's Fourth Amendment claims of unreasonable search and seizure, excessive force, and false arrest asserted against Anderson and Perkins; (2) Plaintiff's Fourteenth Amendment due process claim for deprivation of property asserted against Anderson and Perkins; and (3) Plaintiff's false arrest claim against Ruecker. [3] (Dkt. No. 7 at 3. [4] )

[3]      On initial review, the Court considered Plaintiff's claims that Defendants planted evidence and falsified documents as a part of his claim for false arrest. (*See* Dkt. No. 4 at 12.)

[4]      Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

The District Court dismissed Plaintiff's remaining claims on initial review, including: (1) Plaintiff's malicious prosecution claim against Anderson and Perkins; (2) Plaintiff's conspiracy claim against Ruecker; and (3) Plaintiff's claims against Cheban, Norris, and the City of Albany. (Dkt. No. 7 at 3.) The claims were dismissed without prejudice and with leave to amend. *Id.*

**II. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT**

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)

Case 5:20-cv-01489-DNH-TWD Document 10 Filed 04/21/21 Page 80 of 87

Hawthorne v. City of Albany, Not Reported in Fed. Supp. (2017)

2017 WL 6520774

(citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

**\*2** To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. ANALYSIS OF PLAINTIFF'S AMENDED COMPLAINT

### A. Surviving Claims Against Anderson, Perkins, and Ruecker from Plaintiff's Original Complaint

In his amended complaint, Plaintiff has realleged the unreasonable search and seizure, excessive force, false arrest, and deprivation of property claims against Defendants Anderson and Perkins which survived the initial review of his original complaint. (Dkt. No. 8 at 14-15, 17-20.) Plaintiff has also realleged the false arrest claim against Ruecker that survived initial review. [5] *Id.* at 18-19.

[5]    The elements of a Fourth Amendment false arrest claim under § 1983 are: (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

### B. Malicious Prosecution Claims Against Anderson, Perkins, and Ruecker

The elements of a Fourth Amendment malicious prosecution claim under § 1983 are substantially the same as the elements under New York law. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010). In addition, the Second Circuit requires that a plaintiff demonstrate there was a "post arraignment seizure," since a § 1983 malicious prosecution claim is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013); *see also Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) ("[T]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating claimant's personal liberty and privacy interests under the Fourth Amendment.") (internal quotation marks omitted).

**\*3** Plaintiff's malicious prosecution claim against Anderson and Perkins was dismissed on initial review because his original complaint was devoid of allegations showing that Plaintiff had been arraigned on criminal charges, there had been a post arraignment seizure, he had been prosecuted on the charges, and he had obtained a favorable outcome. (Dkt. No. 4 at 13.) Plaintiff has included an amended malicious prosecution claim against Anderson and Perkins and added a

Case 5:20-cv-01489-DNH-TWD    Document 10    Filed 04/21/21    Page 81 of 87

Hawthorne v. City of Albany, Not Reported in Fed. Supp. (2017)
2017 WL 6520774

malicious prosecution claim against Ruecker in his amended complaint. (Dkt. No. 8 at 14, 19.)

Plaintiff was arraigned on charges of criminal possession of a controlled substance and false impersonation the day following his arrest. *Id.* at 9. The trespass charge against him was dismissed by the court, and Plaintiff was released on his own recognizance. *Id.* Plaintiff was indicted on charges of criminal possession of a controlled substance in the third degree, a class B felony (N.Y. Penal Law § 220.16.16(1)) and criminal possession of a controlled substance in the fourth degree, a class C felony (N.Y. Penal Law § 220.16.09(1)) on June 19, 2005. (Dkt. No. 8-2 at 30-31.) The false impersonation charge was dismissed before trial. (Dkt. No. 8 at 10.) Plaintiff had a jury trial on the criminal possession charges in April of 2016 and was found not guilty by the jury. *Id.*; Dkt. No. 8-3 at 133-34.

Plaintiff was remanded into custody during the trial because he arrived late for jury selection. (Dkt. No. 8 at 10.) According to Plaintiff, the Judge remanded him because she and the prosecution believed they would have a better chance of having Plaintiff plead guilty if he were in jail and would have a better chance of obtaining a guilty verdict if the jury saw him in a jail jumpsuit. (Dkt. No. 8 at 11.)

The Court finds Plaintiff has alleged facts plausibly stating a claim for malicious prosecution under New York law. It is less clear whether being held in custody during his trial is sufficient for Plaintiff to satisfy the requirement of a post-arraignment seizure for a § 1983 malicious prosecution claim. Nonetheless, given that Plaintiff has adequately plead a state law malicious prosecution claim over which the District Court may elect to exercise supplemental jurisdiction and may be able to establish a malicious prosecution claim under § 1983, the Court recommends that Defendants Anderson, Perkins, and Ruecker be required to respond to Plaintiff's malicious prosecution claims.

### C. John Norris
Norris was named as a Defendant in Plaintiff's original complaint, and the Court recommended dismissal because there were no factual allegations in the complaint regarding Norris. (Dkt. No. 4 at 16.) In his amended complaint, Plaintiff alleges after he was strip searched at the precinct, Detectives Ruecker and Norris appeared "with sinister looks and smiles on their faces." (Dkt. No. 8 at 8.) They huddled with Anderson and Perkins whispering and the four then came over and told Plaintiff he was being charged with possession of crack

cocaine. *Id.* Plaintiff alleges he turned to Anderson and said "you guys never found any drugs on me," and Anderson responded "well unless you have information about drugs or people that's (sic) buying or selling drugs, you're going to jail for drug possession." *Id.* Ruecker and Norris allegedly took Plaintiff for questioning. *Id.* Plaintiff claims Norris told him "the crack we have belongs to you. If you want to change that then you need to give us information about drugs in Albany and down in New York City, and individuals bringing drugs from New York City and other cities/states to Albany." *Id.* at 8-9. According to Plaintiff, he was charged with possession of a controlled substance, false impersonation, and trespass after denying any knowledge about drugs and refusing to be interrogated. (Dkt. No. 8 at 8-9.)

 **\*4**  Plaintiff has asserted § 1983 claims against Norris for false arrest and malicious prosecution, with both claims involving the alleged planting of drugs and the falsification of documents in completing the DD5 on the confidential informant who allegedly provided the information leading to Plaintiff's arrest. *Id.* at 20. Mindful of the Second Circuit's direction that a *pro se* plaintiff's pleadings be liberally construed, *see Sealed Plaintiff,* 537 F.3d 191, the Court recommends that Plaintiff's false arrest and malicious prosecution claims against Norris survive *sua sponte* review and require a response.

### D. Sergeant Christ
As noted above, Christ is newly named as a Defendant in Plaintiff's amended complaint. At Plaintiff's criminal trial, Anderson testified Christ was the booking sergeant at the time Plaintiff was brought to the precinct, and any time an officer goes into central booking, he or she has to advise the booking sergeant what is going on. (Dkt. No. 8-3 at 53.) Plaintiff alleges when Christ recognized him from an arrest in 2009, in which Anderson and Perkins had also planted crack cocaine on him and Christ had taken $3,000 from him, Christ allowed Plaintiff to be strip searched and subjected to an anal cavity search at the precinct. (Dkt. No. 8 at 17.) In his amended complaint, Plaintiff claims Christ was present during Plaintiff's strip and anal cavity searches and was at the precinct during his interrogation. (Dkt. No. 8 at 16.)

According to Plaintiff, Christ not only failed to supervise Anderson, Perkins, Ruecker, and Norris, but joined them in their wrongful conduct, including Plaintiff's false arrest and planting the drugs for which Plaintiff was charged. (Dkt. No. 8 at 16.) Plaintiff further alleges Christ failed to supervise Anderson while he was in the evidence room and while doing

Hawthorne v. City of Albany, Not Reported in Fed. Supp. (2017)

2017 WL 6520774

drug testing, and Christ documented Plaintiff as having only $776 and kept the remaining $3,224. *Id.*

While recognizing that the factual allegations against Christ are somewhat sparse, the Court nonetheless finds that in light of Plaintiff's *pro se* status and the Court's duty to liberally construe his amended complaint, Christ should be required to respond to Plaintiff's § 1983 claims for false arrest and violation of Plaintiff's due process claim for deprivation of property in connection with the $3,000 he claims was taken by Christ.

### E. Alex Cheban

The Court recommended dismissal of Plaintiff's original complaint against Cheban because the sole factual allegations against him were that he was contacted by Anderson and Perkins to drive Plaintiff to the precinct and patted Plaintiff down before transporting him there. (Dkt. No. 4 at 11.)

Plaintiff's claim against Cheban relates to the alleged discovery of a plastic bag containing crack cocaine under the back seat of the car in which Cheban had transported Plaintiff to the precinct. [6] According to Anderson's trial testimony, he and Perkins did not strip search and conduct an anal cavity search on Plaintiff at Capitol Green as Plaintiff claims. (Dkt. No. 8-3 at 45-49, 74.) Anderson testified that they did search Plaintiff, including checking the several layers of clothing being worn by Plaintiff. *Id.* According to Anderson, while searching Plaintiff at Capitol Green, he saw a part of a plastic bag between Plaintiff's buttocks. *Id.* He then called for Cheban to transport Plaintiff to the precinct where he could be strip searched. *Id.*

[6]    Plaintiff has included allegations in his amended complaint that Cheban began to drive off as Plaintiff was alighting. (Dkt. No. 8 at 6.) However, Plaintiff has not alleged any injury as a result and has not stated a claim for negligence or an intentional tort.

**\*5**  When no plastic bag was found during Plaintiff's strip and anal cavity searches at the precinct, Cheban was called back to the precinct so the car in which Plaintiff had been transported could be searched. *Id.* at 53-55. Anderson testified he found the plastic bag he had seen when he searched Plaintiff underneath the back seat where Plaintiff had been sitting. *Id.* at 56-57. Cheban testified he saw Perkins take the bag of drugs from under the backseat of the car where Plaintiff had been sitting. *Id.* at 99-100. According to Cheban,

he checked the interior of the car when he went on duty but did not check the back of the car after Plaintiff got out. *Id.*

Plaintiff claims Cheban was involved in planting the drugs under the back seat. (Dkt. No. 8 at 16.) The Court has construed Plaintiff's planting of drugs allegation as a part of Plaintiff's claim for false arrest against Anderson, Perkins, Ruecker, Christ, and Norris and finds that liberally construed, Plaintiff's amended complaint can be read to state claims for false arrest and malicious prosecution against Cheban for purposes of initial review. *See, e.g.*, *Paige-Bey v. City of New York*, No. 13-cv-7300 (SLT) (RER), 2016 WL 7217197, at \*7-8 (E.D.N.Y. Dec. 12, 2016) [7] (allegations police officer planted evidence and perpetuated false testimony at trial sufficient to meet first element of a malicious prosecution claim at motion to dismiss stage).

[7]    Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Therefore, the Court recommends Plaintiff's false arrest and malicious prosecution claims against Norris survive *sua sponte* review and require a response.

### F. City of Albany

Plaintiff named the City of Albany as a Defendant in his original complaint based upon a claim that the City engaged in negligent hiring, retention, and training of it agents, servants, and employees, including the Defendant members of the Albany Police Department. (Dkt. No. 1 at 6.) The Court recommended dismissal of the claim against the City on the grounds that Plaintiff's complaint was devoid of the requisite factual allegations to support his claim (Dkt. No. 4 at 17-18), and Judge Suddaby adopted the recommendation. (Dkt. No. 7 at 2-3.)

Plaintiff, again relying solely on conclusory assertions, has not corrected the deficiencies in his claim against the City of Albany for negligent hiring, retention, and training. (*See* Dkt. No. 8 at 13.) *See Gray-Davis v. New York*, No. 5:14-CV-1490 (GTS/TWD), 2015 WL 2120518, at \*6 (N.D.N.Y. May 5, 2015) (conclusory allegations of failure to properly hire, train, and supervise municipal employees "without supporting factual allegations of, among other things, a policy or custom pursuant to which the alleged action was undertaken, fail to state a claim against [a municipality] that is plausible on its face.")

Case 5:20-cv-01489-DNH-TWD   Document 10   Filed 04/21/21   Page 83 of 87

Hawthorne v. City of Albany, Not Reported in Fed. Supp. (2017)
2017 WL 6520774

Plaintiff has added a supervisory liability claim against the City of Albany for the actions of the Defendants. (Dkt. No. 8 at 13.) However, a municipality may not be held liable under § 1983 based on the theory of *respondeat superior, see Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978), and Plaintiff has failed to allege facts showing the deprivation of his rights was caused by a governmental custom, policy, or usage of the City of Albany. *Id.* at 690-91.

In light of the foregoing, the Court recommends the amended complaint be dismissed against the City of Albany for failure to state a claim. Because Plaintiff has already been given the opportunity to amend his complaint, and the allegations in his amended complaint, construed liberally, give no indication that a valid claim might be stated if Plaintiff were given another opportunity to amend, *see Gomez,* 171 F.3d at 795, the Court recommends that the dismissal against the City of Albany be with prejudice.

**\*6 ACCORDINGLY**, it is hereby

**ORDERED** that the supplemental exhibits to the amended complaint submitted by Plaintiff (Dkt. Nos. 12, 12-1, 12-2, 12-3, 12-4, 12-5, and 12-6) be added to Plaintiff's amended complaint (Dkt. No. 8) and that the amended complaint and supplemental exhibits together be accepted as the operative pleading in the case; and it is hereby

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 8) be **DISMISSED WITH PREJUDICE** against Defendant City of Albany; and it is further

**RECOMMENDED** that Defendants Anderson and Perkins be required to respond to Plaintiff's claims for the unreasonable search and seizure, excessive force, false arrest, and malicious prosecution; and his due process claim for deprivation of property alleged in the amended complaint (Dkt. No. 8.); and it is further

**RECOMMENDED** that Defendants Ruecker, Norris, and Cheban be required to respond to Plaintiff's claims for the false arrest and malicious prosecution claims alleged in the amended complaint (Dkt. No. 8); and it is further

**RECOMMENDED** that Defendant Christ be required to respond to Plaintiff's claim for false arrest, and his due claim for deprivation of property alleged in the amended complaint (Dkt. No. 8); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[8]     If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6520774

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

[1]    At the time the action was originally filed,
the Honorable Leonard B. Sand, United States
District Judge, granted plaintiff's application for *in
forma pauperis* status based on plaintiff's *ex parte*
submission (Docket Item 1). Although the present
application seeking to revoke plaintiff's *in forma
pauperis* status is non-dispositive, I address it by
way of a report and recommendation to eliminate
any appearance of a conflict between the decision
of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1**  TO THE HONORABLE BARBARA S. JONES, United
States District Judge,

I. *Introduction*
By notice of motion dated March 4, 2010 (Docket Item 11),
defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke
plaintiff's *in forma pauperis* ("IFP") status on the ground that
plaintiff has previously had at least three Section 1983 actions
dismissed as frivolous, malicious or failing to state a claim
upon which relief could be granted, and has not shown that he
is in imminent danger of serious physical injury. Defendant
further seeks an order directing that the action be dismissed
unless plaintiff pays the full filing fee within thirty (30) days.
For the reasons set forth below, I respectfully recommend that
defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New
York State Department of Correctional Services, commenced
this action on or about January 12, 2009 by submitting his
complaint to the Court's Pro Se office. Plaintiff alleges, in
pertinent part, that he has "a non-healing ulcer that is gane
green [*sic* ]" and that defendant Bernstein "did not want
to treat the ulcer right" (Complaint, dated March 3, 3009
(Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants
—Dr. Bernstein and Dr. Finkelstein. The action was dismissed
as to Dr. Finkelstein because the complaint contained no
allegations whatsoever concerning Dr. Finkelstein (Order
dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr.
Bernstein—filed the current motion. Plaintiff failed to submit
a response. Accordingly, on August 20, 2010, I issued an
Order advising plaintiff that if he wished to oppose the
motion, he must submit his opposition by September 15, 2010
and that after that date I would consider the motion fully
submitted and ripe for decision (Order dated August 20, 2010
(Docket Item 15)). The only submission plaintiff has made
in response to my Order is a multi-part form issued by the
New York State Department of Correctional Services entitled
"Disbursement or Refund Request." [2] By this form, plaintiff
appears to request that the New York State Department of
Correctional Services pay the filing fee for this action. The
form is marked "Denied."

[2]    Plaintiff sent this form directly to my chambers,
and it has not been docketed by the Clerk of the
Court. The form will be docketed at the time this
Report and Recommendation is issued.

III. *Analysis*
28 U.S.C. § 1915 permits an indigent litigant to commence
an action in a federal court without prepayment of the filing
fee that would ordinarily be charged. Although an indigent,
incarcerated individual need not prepay the filing fee at the
time at the time of filing, he must subsequently pay the fee,
to the extent he is able to do so, through periodic withdrawals
from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v.
City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent
abuse of the judicial system by inmates, paragraph (g) of
this provision denies incarcerated individuals the right to
proceed without prepayment of the filing fee if they have
repeatedly filed meritless actions, unless such an individual
shows that he or she is in imminent danger of serious

physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

3    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United

States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009). [4]

[4]   Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci[a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's

history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

[5]   Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4. Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

## V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and

2010 WL 5185047

responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155

(1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.